No. 99-158

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 209

FRIENDS OF THE WILD SWAN, a

nonprofit corporation,

Plaintiff, Respondent, and

Cross-Appellant,

v.

DEPARTMENT OF NATURAL RESOURCES

AND CONSERVATION,

Defendant, Appellant, and

Cross-Respondent.

APPEAL FROM: District Court of the First Judicial District,

In and for the County of Lewis and Clark,

The Honorable Thomas C. Honzel, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Tom Butler and Michael J. Mortimer, Montana Department of

Natural Resources & Conservation, Helena, Montana

For Respondent:

Stephen C. Pohl, Attorney at Law, Bozeman, Montana

For Amicus:

Rebecca W. Watson, Gough, Shanahan, Johnson & Waterman,

Helena, Montana

Submitted on Briefs: November 4, 1999

Decided: August 8, 2000

Filed:

_____

Clerk

Justice Terry N. Trieweiler delivered the opinion of the Court.

¶1 The Plaintiff, Friends of the Wild Swan, brought this action in the District Court for the First Judicial District in Lewis and Clark County to challenge the sufficiency of the Environmental Impact Statement (EIS) prepared by the Defendant, Montana Department of Natural Resources and Conservation (DNRC), for the Middle Soup Creek Project pursuant to the Montana Environmental Policy Act (MEPA) §§ 75-1-201, et seq., MCA. The District Court held that the EIS prepared by the DNRC inadequately addressed the cumulative impacts of the project and also held that the DNRC should have prepared a supplemental EIS due to changed economic circumstances of the project. The District Court enjoined any harvest of timber on the Middle Soup Creek Project until the DNRC prepares the supplemental EIS. DNRC appeals from that judgment. Friends of the Wild Swan cross-appeals from the District Court's denial of Rule 11 sanctions against the DNRC. We affirm the judgment of the District Court.

¶2 The following issues are presented on appeal by the DNRC:

¶3 1. Did the District Court err when it held that the DNRC violated the MEPA by its failure to include an adequate cumulative impacts analysis in its EIS?

¶4 2. Did the District Court err when it held that the DNRC was required to prepare a

supplemental EIS?

¶5 3. Did the District Court err when it held that Friends of the Wild Swan was not required to provide a postappeal injunction bond pursuant to § 77-1-110, MCA?

¶6 The following issue is presented on cross-appeal by Friends of the Wild Swan:

¶7 4. Did the District Court err when it denied Friends of the Wild Swan's motion for imposition of Rule 11, M.R.Civ.P., sanctions against the DNRC?

## FACTUAL BACKGROUND

¶8 This dispute relates to the DNRC's proposed timber sale, known as the Middle Soup Creek Project, on land near Swan Lake, Montana. The land is owned by the State of Montana and held in trust by the DNRC for the support of the public schools pursuant to Article X of the Montana Constitution. The purpose of the project is to generate both short- and long-term revenue for the Montana School Trust. The project, as originally proposed, involved the harvest of approximately 6 million board feet of timber on 2591 acres of Swan Valley forest. Approximately 50 percent of the Swan Valley forest consists of old growth, including one of the last large stands of old growth remaining in Montana.

¶9 In September 1996, the DNRC issued a draft EIS which discussed the impacts of four alternative management plans for the Middle Soup Creek Project. Alternative "A" required no action and would have left the Middle Soup Creek area unmanaged and permitted the DNRC to enter into a 20-year conservation lease. Alternative "B" required intensive management and was designed to promote sustainability of the ecosystem by harvesting approximately 5.2 million board feet of timber. Alternative "C" required preservation of old growth timber, while permitting the harvest of approximately 150,000 board feet of saw-timber stand. Alternative "D" maximized timber productivity by harvesting approximately 5.6 million board feet of old growth, saw-timber, and multistoried stands.

¶10 Following public hearings and comments, the DNRC issued the final Middle Soup Creek Project EIS in February 1997. Alternative "B" was identified as the preferred alternative because of its economic viability and its positive short- and long-term benefits in accordance with the State Forest Land Management Plan philosophy and its Resource Management Standards. Alternative "B" was projected to generate approximately $1,045,572 in net revenue in the short-term, and was to be accomplished by using a

harvesting process known as "structural enhancement," in which selected trees would be cut in order to mimic historical forest conditions.

¶11 In July 1997, the Board of Land Commissioners approved the Middle Soup Creek timber sale. The minutes of the board's meeting reflect their approval of a harvest of approximately 3.8 million board feet from 970 acres of the Swan Valley forest. There was no explanation for reduction of the sale from 5.2 million board feet as proposed in the final EIS to 3.8 million board feet as approved by the board.

¶12 On September 4, 1997, Friends of the Wild Swan, a Montana nonprofit corporation dedicated to preserving the natural environment of the Swan Valley, filed a complaint alleging various violations of the MEPA by the DNRC in its final EIS, including inadequate environmental analysis. Friends of the Wild Swan sought an order directing the DNRC to complete an EIS in accordance with the MEPA and an injunction prohibiting the DNRC from proceeding with any activity in furtherance of the Middle Soup Creek Project until a proper EIS was prepared.

¶13 On September 10, 1997, the DNRC entered into a contract with Plum Creek Manufacturing Company for the harvest of 3.8 million board feet of timber on the Middle Soup Creek Project. Pursuant to the contract, the DNRC staff marked the trees to be harvested by Plum Creek with orange paint.

¶14 Following the DNRC's selection of trees to be harvested, Friends of the Wild Swan requested Sara Johnson, Ph.D., a wildlife biologist, to review the site of the sale, the selection of trees by the DNRC, and the final EIS. Johnson concluded that the selection of trees by the DNRC was more extensive than described by the final EIS, and that the final EIS was misleading to the public regarding the amount of old growth timber to be harvested.

¶15 On January 5, 1998, Friends of the Wild Swan and the DNRC stipulated that no timber would be harvested on the Middle Soup Creek Project until December 1, 1998. As a result of the parties' stipulation, Friends of the Wild Swan withdrew its pending motion for a preliminary injunction.

¶16 On March 16, 1998, the DNRC sent a letter to all interested parties and acknowledged that it had made a mistake when it identified the trees to be harvested by Plum Creek. The DNRC explained that proper identification of the trees would result in a harvest of fewer

and smaller trees, which in turn would reduce the volume of timber harvested from 3.8 million board feet to 1.99 million board feet. Because of the reduction in volume and tree size, the DNRC and Plum Creek negotiated a reduced price per thousand board feet of timber harvested.

¶17 On October 6, 1998, Friends of the Wild Swan filed its Second Amended Complaint which added the alleged MEPA violation of failure to prepare a supplemental EIS in light of the changed economic circumstances of the sale.

¶18 On October 15 and 16, 1998, the District Court held a hearing to consider the merits of Friends of the Wild Swan's complaint.

¶19 The parties' stipulation that no harvest would occur expired on December 1, 1998. Friends of the Wild Swan received a letter from the DNRC dated November 27, 1998, which informed them that "Plum Creek timber Company is preparing to begin harvesting operations on December 1 or as soon after that date when the desired environmental conditions are achieved." The letter further informed them that the "sale contract allows logging activities to begin on December 1, 1998, if there is at least 18 inches of snow accumulation and freezing temperatures. Logging activities may begin on December 15 if there is at least 24 inches of snow accumulation, even though temperatures may not be freezing." Friends of the Wild Swan recognized that these environmental conditions were also set forth in the EIS as required mitigators for reducing impact upon the soil.

¶20 In an affidavit dated January 14, 1999, Arlene Montgomery, Director of Friends of the Wild Swan, stated that she personally made visits to the Middle Soup Creek Project area on November 28 and December 18, 1998, and on both occasions it was raining and muddy, there was no measurable snow accumulation on the ground, nor was the ground frozen.

¶21 On December 23, 1998, the District Court issued its findings of fact, conclusions of law, and order in which the District Court held that the DNRC was required to include a cumulative impacts analysis in the EIS and a supplemental EIS as a result of the change in economic circumstances. The order enjoined the DNRC from proceeding with further activities relating to the Middle Soup Creek Project until the supplemental EIS and the cumulative impacts analysis have been prepared.

¶22 On December 29, 1998, the DNRC filed a motion and brief requesting the District

Court to modify the injunction issued in its December 23, 1998 order. In its motion, the DNRC admitted that it had allowed Plum Creek to commence harvesting timber on the Middle Soup Creek Project on December 15, 1998, and then ordered Plum Creek to cease activities upon receipt of the District Court's order on December 23, 1998. As a result, the DNRC requested the District Court to modify its injunction to allow the DNRC and Plum Creek to remove any timber that was felled prior to December 23, 1998. Additionally, the DNRC requested that the District Court require Friends of the Wild Swan to post an injunction bond pursuant to § 77-1-110, MCA, to compensate the school trust beneficiaries should the injunction be wrongful.

¶23 On January 11, 1999, the DNRC sent a letter to Arlene Montgomery, Director of Friends of the Wild Swan, which detailed the timber harvesting that occurred prior to December 23, 1998 on the Middle Soup Creek Project. The DNRC explained that 90,000 board feet of timber was cut by Plum Creek during that time and that the harvesting was done pursuant to a timber sale inspection report in which the DNRC "gave approval for the felling of timber in Unit #1 to proceed, but due to unfrozen wet soils . . . did not allow skidding activities to proceed."

¶24 On January 21, 1999, Friends of the Wild Swan sought Rule 11, M.R.Civ.P. sanctions against the DNRC for its motion to modify the injunction and request for Friends of the Wild Swan to post an injunction bond.

¶25 On February 26, 1999, the District Court issued its memorandum and order denying the DNRC's motion for modification of the injunction and request for an injunction bond and denying Friends of the Wild Swan's motion for Rule 11 sanctions.

¶26 The DNRC filed its notice of appeal on March 2, 1999, and Friends of the Wild Swan filed its notice of cross-appeal on March 16, 1999.

## STANDARD OF REVIEW

¶27 The proper standard of review of an administrative decision pursuant to the Montana Environmental Policy Act (MEPA), is whether the record establishes that the agency acted arbitrarily, capriciously or unlawfully. *North Fork Preservation Ass'n v. Department of State Lands* (1989), 238 Mont. 451, 465, 778 P.2d 862, 871. In *North Fork Preservation Ass'n*, we stated that:

[I]n making the factual inquiry concerning whether an agency decision was "arbitrary or capricious," the reviewing court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." This inquiry must "be searching and careful," but "the ultimate standard of review is a narrow one."

*North Fork Preservation Ass'n, 238 Mont. at 465, 778 P.2d at 871 (quoting Marsh v. Oregon Natural Resources Council (1989), 490 U.S. 360, 378).*

¶28 In *Marsh,* the U.S. Supreme Court stated:

[I]n the context of reviewing a decision not to supplement an EIS, courts should not automatically defer to the agency's express reliance on an interest in finality without carefully reviewing the record and satisfying themselves that the agency has made a reasoned decision based on its evaluation of the significance-or lack of significance-of the new information. A contrary approach would not simply render judicial review generally meaningless, but would be contrary to the demand that courts ensure that agency decisions are founded on a reasoned evaluation "of the relevant factors."

*Marsh, 490 U.S. at 378.*

¶29 In *North Fork Preservation Ass'n*, 238 Mont. at 460, 778 P.2d at 868, we stated that the omission of the cumulative impacts analysis was directly relevant to the "unlawful" portion of our standard of review.

## DISCUSSION

## ISSUE 1

¶30 Did the District Court err when it held that the DNRC violated the MEPA as a result of its failure to include an adequate cumulative impacts analysis in its EIS?

¶31 The DNRC asserts that the District Court erred when it found that the EIS prepared by the DNRC for the Middle Soup Creek Project was insufficient because it did not adequately analyze and discuss the cumulative impacts of the project. The DNRC contends that the District Court failed to comprehend that the new "coarse filter" ecological analysis takes into account all of the prevailing conditions of the affected lands

and therefore incorporates a cumulative effects analysis. The DNRC argues that the District Court's primary error was its "disregard for the evidence presented that each of the court's concerns had in fact been considered in the preparation of the final EIS, and that the cumulative impacts of all the past and present actions were carefully considered."

¶32 In response, Friends of the Wild Swan contends that even if the DRNC's new "coarse filter" approach is recognized as valid and includes cumulative impacts analysis as part of its methodology, the MEPA still requires a cumulative impacts analysis in every EIS and therefore the DNRC is required to include the requisite discussion in its EIS.

¶33 The Administrative Rules of Montana provide in relevant part as follows:

> **36.2.529 Preparation and Contents of Draft Environmental Impact Statements**
>
> **If required by these rules, the agency shall prepare a draft environmental impact statement using an interdisciplinary approach and containing the following:**
>
> . . . .
>
> (4) a description of the impacts on the quality of the human environment of the proposed action including:
>
> . . . .
>
> (b) primary, secondary, and cumulative impacts;
>
> **36.2.522 Definitions**
>
> . . . .
>
> **(7) "Cumulative impact" means the collective impacts on the human environment of the proposed action when considered in conjunction with other past and present actions related to the proposed action by location or generic type. Related future actions must also be considered when these actions are under concurrent consideration by any state agency through pre-impact statement studies, separate impact statement evaluation, or permit processing procedures.**
>
> . . . .

(12) "Human environment" includes, but is not limited to biological, physical, social, economic, cultural, and aesthetic factors that interrelate to form the environment. As the term applies to the agency's determination of whether an EIS is necessary, economic and social impacts do not by themselves require an EIS. However, whenever an EIS is prepared, economic and social impacts and their relationship to biological, physical, cultural and aesthetic impacts must be discussed.

¶34 The District Court found that:

The purpose of allowing public involvement in environmental decision-making is frustrated if an EIS does not accurately describe the impact of proposed action in the context of past, present and future proposed action. The average member of the public must rely on DNRC's expertise, and therefore, DNRC must give sufficient information so that the public can make a meaningful evaluation of the proposed action. To do so, a thorough analysis and discussion of cumulative impacts is necessary. The legislature recognized as much, making a cumulative impacts analysis mandatory. A thorough analysis of cumulative impacts is lacking here.

¶35 The DNRC argues that the District Court's findings were erroneous because, although Rule 36.2.529, ARM, requires a cumulative effects analysis, the Administrative Rules do not dictate any particular methodology. However, we conclude that Rule 36.2.529(4)(b), ARM, clearly states that the EIS shall contain a <u>description</u> of the cumulative effects and does not allow, as the DRNC suggests, mere analysis implicit within the EIS. The public is not benefited by reviewing an EIS which does not explicitly set forth the actual cumulative impacts analysis and the facts which form the basis for the analysis.

¶36 The DNRC additionally argues that the District Court erred when it relied on Rule 36.2.524(1)(g), ARM, to conclude that the DNRC's cumulative impacts analysis was also inadequate for its failure to reconcile the proposed action with the State Forest Land Management Plan (SFLMP). The DNRC states that Rule 36.2.524, ARM, "applies only to the analysis performed in attempting to ascertain whether an EIS should be prepared. . . . This section is not a substantive element to be contained within an EIS."

¶37 Rule 36.2.524, ARM, states, in relevant part:

(1) In order to implement 75-1-201, MCA, the agency shall determine the significance of impacts associated with a proposed action. This determination is the

basis of the agency's decision concerning the need to prepare an EIS and *also refers to the agency's evaluation of individual and cumulative impacts in either EAs or EISs.* The agency shall consider the following criteria in determining the significance of each impact on the quality of the human environment:

. . . .

*(g) potential conflict with local, state, or federal laws, requirements, or formal plans;*

(Emphasis added.) Clearly, Rule 36.2.524, ARM, pertains to the contents of an EIS, in addition to the decision of whether or not to prepare an EIS.

¶38 The DNRC further contends that the EIS did discuss the SFLMP. We note that the District Court did recognize discussion of the SFLMP, stating that: "Although the Middle Soup Creek final EIS does discuss old growth and fragmentation, listing them as 'concerns,' it does not discuss the SFLMP's objective to preserve old growth, reduce fragmentation, and protect unique habitat." The District Court was correct.

¶39 Accordingly, we conclude that the EIS prepared by the DNRC fails to comport with the provision in Rule 36.2.529(4)(b), ARM, which requires an explicit discussion of the cumulative impacts analysis, in accordance with the definitions of "cumulative impact" and "human environment" set forth at Rule 36.2.522, ARM, or with the provision provided by Rule 36.2.524(1)(g), ARM. As a result, we conclude that the DNRC acted unlawfully, in violation of the MEPA, in its preparation of the EIS for the Middle Soup Creek Project. Therefore, we further conclude that the District Court did not err when it held that the DNRC violated the MEPA as a result of its failure to include an adequate cumulative impacts analysis in its EIS.

## ISSUE 2

¶40 Did the District Court err when it held that the DNRC was required to prepare a supplemental EIS?

¶41 The DNRC contends that the District Court erred by concluding that a supplemental EIS is required, because there was no proof offered by Friends of the Wild Swan that a reduction in the total timber sale revenue would result in any physical impact to the human environment. The DNRC argues based on Rule 36.2.522(12), ARM, that a change in economic impacts alone does not compel the preparation of a supplemental EIS. The

DNRC further asserts that it acted reasonably in preparing its economic estimate and did not portray the economic returns in the EIS as reliable estimates of absolute, guaranteed revenues.

¶42 In response, Friends of the Wild Swan asserts that the DNRC's failure to supplement the EIS was arbitrary and capricious in light of the substantial changes in the proposed action. Friends of the Wild Swan points out that the final EIS described a sale of nearly 6 million board feet of timber, estimated to net over a million dollars in revenue for the school trust. Whereas, the sale as now proposed describes a sale of 1.99 million board feet of timber, which is estimated to result in a loss to the State.

¶43 The final EIS identifies Alternative "B" as the preferred alternative and sets forth an estimated sale of 5.2 million board feet of timber. The final EIS further states that Alternative "B" is projected to generate approximately $1,045,572 of net revenue in the short-term. The final EIS states that:

> The objective of the Middle Soup Creek Project is to generate the largest, reasonable monetary return to the school trust in both the short term and long term by either selling approximately six million board feet of timber or selling a twenty-year conservation lease. Alternatives A and C are each projected to generate negative net revenue if harvested this year or if harvesting is deferred for twenty years. These alternatives do not meet the project objective and therefore are not considered further.

¶44 It appears that by the time of the meeting of the Board of Land Commissioners on July 21, 1997, the DNRC had re-estimated the Middle Soup Creek Timber Sale to include the sale of 3.8 million board feet of timber and $812,605 in revenue. In April 1998, following the discovery of the mismarked trees in the Middle Soup Creek Project, the DNRC notified Friends of the Wild Swan that the project would be further reduced to 1.99 million board feet of timber and $350,000 in revenue. However, the costs to the State of the Middle Soup Creek Project, including the MEPA costs, sale preparation costs, administrative costs and treatment costs has reached approximately $500,000. Accordingly, the DNRC's proposed sale of 1.99 million board feet results in a loss of approximately $150,000 to the State.

¶45 Rule 36.2.533, ARM, provides in relevant part as follows:

(1) The agency shall prepare supplements to either draft or final environmental impact statements whenever:

> (a) the agency or the applicant makes a substantial change in a proposed action;
>
> . . . .
>
> (2) A supplement must include, but is not limited to, a description of the following:
>
> . . . .
>
> (c) any impacts, alternatives or other items required by ARM 36.2.529 for a draft EIS or ARM 36.2.531 for a final EIS that were either not covered in the original statement or that must be revised based on new information or circumstances concerning the proposed action.

¶46 We conclude that, contrary to the DNRC's assertions, there is no requirement in Rule 36.2.533, ARM, that a substantial change must result in an additional impact to the environment before a supplemental EIS is required. There is no limitation on what may be considered a "substantial change". Accordingly, we further conclude that a substantial economic change in a project can serve as the basis for the supplemental EIS required by Rule 36.2.533, ARM.

¶47 In this case, the District Court found that:

> The substantial change in the harvest quantity and in the net revenue resulting from the harvest certainly are "substantial changes" to the proposed action. Indeed, the motivation for the sale, producing net revenue for the trust, has been completely removed. The sale now will cost the State money. The public and the Board of Land Commissioners may have been willing to lose valuable old growth timber for the benefit of substantial revenue to the trust, but the cost benefit had now been substantially changed. The public may not be willing, and the Board of Land Commissioners may not wish to require the public to pay to lose its old growth timber.

¶48 We conclude that the change in economic circumstances in the Middle Soup Creek Project was a "substantial change" pursuant to Rule 36.2.533, ARM, which required the

preparation of a supplemental EIS. Accordingly, we conclude that the DNRC's decision not to supplement the EIS was a clear error of judgment. Therefore, we further conclude that the District Court did not err when it held that the DNRC was required to prepare a supplemental EIS.

## ISSUE 3

¶49 Did the District Court err when it held that Friends of the Wild Swan was not required to post a postappeal injunction bond pursuant to § 77-1-110, MCA?

¶50 The DNRC contends that § 77-1-110, MCA, required the District Court to order Friends of the Wild Swan to post an injunction bond during the pendency of this appeal.

¶51 Section 77-1-110, MCA, provides:

> In any civil action seeking an injunction or restraining order concerning a decision of the board approving a use or disposition of state lands that would produce revenue for any state lands trust beneficiary, the court shall require a written undertaking for the payment of damages that may be incurred by the trust beneficiary if the board is wrongfully enjoined or restrained.

¶52 The District Court concluded that because the Middle Soup sale was expected to lose money, it would be difficult to comprehend how damages might be incurred as a result of enjoining the project and, therefore, concluded that Friends of the Wild Swan was not required to post a bond.

¶53 On appeal, Friends of the Wild Swan contends that the DNRC has no standing to invoke § 77-1-110, MCA, because that statute only pertains to actions enjoining a decision of the State Land Board. Friends of the Wild Swan argues that, here, no injunction has been issued against the Land Board, nor is the Land Board even a party to this action.

¶54 Section 77-1-110, MCA, provides for a bond in a civil action "seeking an injunction or restraining order *concerning a decision of the board*" for damages "that may be incurred by the trust beneficiary if the *board* is wrongfully enjoined or restrained." (Emphasis added.) This statute does not apply to this case which deals with an injunction against the DRNC based on the inadequacy of its EIS and has no effect on the Land Board's decision.

¶55 Therefore, we conclude that the District Court came to the right conclusion, whether or not it was for the right reason and that Friends of the Wild Swan was not required to post an injunction bond pursuant to § 77-1-110, MCA.

## ISSUE 4

¶56 The following issue is presented on cross-appeal by Friends of the Wild Swan:

¶57 Did the District Court err when it denied Friends of the Wild Swan's motion for imposition of Rule 11, M.R.Civ.P., sanctions against the DNRC?

¶58 This Court gives a district court broad discretion to determine whether the factual circumstances of a particular case amount to frivolous or abusive litigation tactics. Accordingly, we apply the following standard of review:

> A district court's findings of fact will be overturned if clearly erroneous. The court's legal conclusion that the facts constitute a violation of Rule 11 will be reversed if the determination constitutes an abuse of discretion. We will review the case de novo only if the violation is based on the legal sufficiency of a plea or motion.

*D'Agostino v. Swanson (1990), 240 Mont. 435, 446, 784 P.2d 919, 926.*

¶59 Friends of the Wild Swan contends that Rule 11, M.R.Civ.P. clearly applies to the circumstances underlying the DNRC's request for an injunction bond pursuant to § 77-1-110, MCA, and request for modification of the District Court's injunction. Friends of the Wild Swan asserts that the DNRC's request of the District Court to allow it to sell the "illegally harvested timber" and to require an injunction bond, was made solely to harass and cause needless increase in the costs of this litigation.

¶60 Rule 11, M.R.Civ.P., provides:

> The signature of an attorney or party constitutes a certificate by the signer that the signer had read the pleading, motion, or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or increase in

the cost of litigation . . . . If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction . . . .

¶61 The District Court found the following:

The fact that DNRC may have violated the mitigation controls prescribed in the EIS does not implicate Rule 11. If DNRC acted in bad faith or violated the EIS, there are specific statutory remedies, but Rule 11 sanctions is not one of those remedies. Nor does Rule 11 constitute grounds to impose sanctions merely because DNRC sought to have a bond posted. Section 77-1-110, MCA, is a fairly new provision, having been enacted in 1995. The Court cannot say DNRC acted in bad faith by seeking to have a bond posted. Therefore, the Court declines to impose Rule 11 sanctions against DNRC.

¶62 We conclude that the District Court's findings that the DNRC did not act in bad faith are not clearly erroneous, and that the District Court did not abuse its discretion. Therefore, we affirm the District Court's denial of Rule 11, M.R.Civ.P. sanctions against the DNRC.

¶63 The judgment of the District Court is affirmed.

/S/ TERRY N. TRIEWEILER

We Concur:

/S/ KARLA M. GRAY

/S/ JIM REGNIER

/S/ JAMES C. NELSON

/S/ W. WILLIAM LEAPHART