FILED

January 12 2016

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 15-0208

DA 15-0208

IN THE SUPREME COURT OF THE STATE OF MONTANA

2016 MT 9

MONTANA ENVIRONMENTAL INFORMATION
CENTER,

       Plaintiff and Appellant,

   v.

MONTANA DEPARTMENT OF ENVIRONMENTAL
QUALITY and GOLDEN SUNLIGHT MINES, INC.,

       Defendants and Appellees,

JEFFERSON COUNTY, a Political subdivision of
the State of Montana,

       Defendant and Intervenor.

APPEAL FROM:    District Court of the Fifth Judicial District,
                      In and For the County of Jefferson, Cause No. DV 2014-36
                      Honorable Loren Tucker, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

              David K. W. Wilson, Jr., Morrison, Sherwood, Wilson & Deola, PLLP,
              Helena, Montana

              Elizabeth A. Brennan, Brennan Law & Mediation, PLLC, Missoula,
              Montana

       For Appellees:

              KD Feeback, Toole & Feeback, PLLC, Lincoln, Montana

              R. Timothy McCrum, Thomas R. Lundquist, Crowell & Moring LLP,
              Washington, DC
              (*Attorneys for Golden Sunlight Mines, Inc.*)

John North, Ed Hayes, Department of Environmental Quality, Helena, Montana

Mathew Johnson, Jefferson County Attorney, Steven C. Haddon, Deputy County Attorney, Boulder, Montana

Submitted on Briefs:  November 4, 2015
Decided:  January 12, 2016

Filed:

_____
Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1 The Montana Environmental Information Center (MEIC) appeals from an order issued by the Fifth Judicial District Court, Jefferson County, granting summary judgment in favor of the Montana Department of Environmental Quality (DEQ) and Golden Sunlight Mines, Inc (GSM). We affirm.

¶2 In April 2014, MEIC filed suit in the Fifth Judicial District Court, challenging the DEQ's decision to approve the expansion of GSM's gold mine to include a smaller nearby pit. MEIC contended that the reclamation plan the DEQ chose to reclaim the nearby pit violated Article IX, Section 2 of the Montana Constitution and the Montana Metal Mine Reclamation Act (MMRA), § 82-4-301, MCA, et seq. MEIC argued that Article IX, Section 2 of the Montana Constitution and the MMRA require land disturbed by the taking of natural resources to be "fully reclaimed" to its previous condition, and that the reclamation plan the DEQ chose to reclaim the pit failed to do so. MEIC maintained that the DEQ must adopt a reclamation plan that requires GSM to completely backfill the pit after closure in order to comply with the Montana Constitution and the MMRA. MEIC also contended that the DEQ's decision to select the particular reclamation plan was arbitrary and capricious because the criteria set forth in the MMRA were not satisfied.

¶3 In response, the Appellees asserted that MEIC should be collaterally estopped from relitigating whether the Montana Constitution and the MMRA require lands disturbed by a mining operation to be fully reclaimed. Appellees argued that, in

3

connection with a reclamation plan for a different pit at GSM's mine, this precise question had already been litigated, with MEIC receiving an adverse ruling from the District Court. Alternatively, the Appellees argued that neither the Montana Constitution nor the MMRA require full reclamation of disturbed lands. The Appellees also maintained that the DEQ's decision regarding its choice of reclamation plans was supported by substantial evidence under the criteria set forth in the MMRA.

¶4 The District Court agreed with the Appellees, concluding that MEIC's constitutional and statutory arguments were collaterally estopped and the DEQ's decision was supported by the evidence under the MMRA criteria. We affirm the District Court's decision regarding collateral estoppel and thus do not address the merits of whether Article IX, Section 2 of the Montana Constitution and the MMRA require land disturbed by the taking of natural resources to be fully reclaimed to its previous condition. We also affirm the District Court's holding that the criteria under the MMRA were satisfied.

¶5 We address the following issues on appeal:

*1. Whether MEIC is precluded from relitigating the issue of whether Article IX, Section 2 of the Montana Constitution requires land disturbed by the taking of natural resources to be fully reclaimed to its previous condition.*

*2. Whether MEIC is precluded from relitigating the issue of whether the Montana Metal Mine Reclamation Act requires land disturbed by the taking of natural resources to be fully reclaimed to its previous condition.*

*3. Whether the DEQ made a reasoned decision in selecting the Agency-Modified Alternative under the criteria set forth in the Montana Metal Mine Reclamation Act.*

4

## FACTUAL AND PROCEDURAL BACKGROUND

¶6 Golden Sunlight Mines operates an open pit gold mine on the southern edge of the Bull Mountains near Whitehall, Montana. In September 2012, GSM submitted an application to the DEQ to amend the operating permit for its mine, proposing to expand its mining operation to develop a smaller nearby pit that the parties refer to as the North Area Pit. The North Area Pit is estimated to cover approximately 49.4 acres. The expansion would allow GSM to mine an additional 4.2 million tons of gold ore and extend GSM's current mining operation by about two years. GSM proposed mining the North Area Pit through the use of conventional open pit mining methods which would be consistent with its current mining operation. In order to obtain the gold ore beneath the North Area Pit, GSM proposed excavating below the natural water table and installing external dewatering wells adjacent to the North Area Pit to lower the water table beneath the pit and allow for the mineral extraction.

¶7 As part of the proposed expansion, GSM submitted a reclamation plan for the North Area Pit to the DEQ. In 2013, the DEQ issued a draft Environmental Impact Statement (EIS) which discussed the impacts of four alternative reclamation plans for the North Area Pit: (1) the No Action Alternative; (2) the GSM Proposed Reclamation Alternative; (3) the Agency-Modified Alternative; and (4) the North Area Pit Backfill Alternative. The No Action Alternative reflects the current mining operation conducted under GSM's existing permit with no management plan for an additional disturbance at the North Area Pit. Under the GSM Proposed Reclamation Alternative, the

5

approximately 52.6 million tons of non-ore waste rock that will be generated from the North Area Pit will be primarily placed in an expansion area on the east side of the mine. The GSM Proposed Reclamation Alternative requires GSM to continue to operate its external dewatering wells after closure of the mine to prevent contamination of local groundwater. In addition, GSM must install an underground in-pit sump to protect against local groundwater contamination in the event that one of the external dewatering wells fails. The Agency-Modified Alternative is the same as the GSM Proposed Reclamation Alternative with the exception of various additional modifications developed by the DEQ to further mitigate environmental impacts associated with the mining. These modifications include: (1) the implementation of closure geodetic and ground-movement monitoring for the North Area Pit to ensure safe access and to keep reclamation systems working, and (2) the preparation of a detailed bat and raptor habitat plan for the North Area Pit to provide habitat and add utility to the North Area Pit highwall. Lastly, the fourth proposed reclamation plan identified as the North Area Pit Backfill Alternative requires GSM to use 9.2 million tons of waste rock from the mine to backfill the North Area Pit. Like the GSM Proposed Reclamation Alternative and the Agency-Modified Alternative, the Backfill Alternative requires GSM to continue to operate the external dewatering wells after closure. However, unlike the other alternatives, the Backfill Alternative does not allow for the installation of an in-pit sump to protect against contamination of local groundwater in the event of an external dewatering well failure. In the draft EIS, the DEQ extensively analyzed the advantages

6

and disadvantages associated with these four alternatives and evaluated the alternatives in light of the criteria set forth in the MMRA.

¶8     Following a public hearing and comments, the DEQ issued a final EIS identifying the Agency-Modified Alternative as the preferred alternative. In rejecting the Backfill Alternative, the DEQ recognized several benefits associated with the Backfill Alternative, including better structural stability, increased wildlife habitat, and added aesthetic value. However, despite these advantages, the DEQ rejected the Backfill Alternative in lieu of the Agency-Modified Alternative, concluding that the Backfill Alternative failed to sufficiently mitigate the risk of groundwater contamination because it did not permit GSM to install an in-pit sump. The DEQ explained that local groundwater and surface water contamination could result if the natural water table rebounds and comes into contact with the acidic North Area Pit highwalls. The DEQ found that unlike the Agency-Modified Alternative in which the underground sump would prevent the water table from rebounding in the event of an external dewatering well failure, "[i]f the external dewatering wells were to fail under the North Area Pit Backfill Alternative, it is unlikely that replacement wells could be installed before impacted groundwater begins to discharge from the North Area Pit." Thus, the DEQ explained that it chose the Agency-Modified Alternative rather than the Backfill Alternative because the Agency-Modified Alternative provided adequate assurance that pollution of the local aquifers and surface waters would not occur. The Backfill Alternative did not provide such assurances.

¶9 On January 9, 2014, the DEQ approved the expansion of GSM's mine to include the proposed North Area Pit and issued a Record of Decision (ROD) outlining the reasons for its decision. On April 8, 2014, MEIC filed its complaint, challenging the DEQ's decision to approve the expansion of the existing mining operation to include the North Area Pit with the Agency-Modified Alternative as the chosen reclamation plan. MEIC contended that the DEQ's decision to choose the Agency-Modified Alternative violated the Montana Constitution and the MMRA. MEIC argued that Article IX, Section 2 of the Montana Constitution requires that all land disturbed by a mining operation must be "fully reclaimed" to its previous condition, and that, because of this constitutional mandate, the MMRA must also require all lands to be fully reclaimed. MEIC further sought a legal declaration from the District Court that to the extent the MMRA could be interpreted to "allow less than full reclamation" the MMRA violated Article IX, Section 2 of the Montana Constitution. Finally, MEIC maintained that the DEQ's decision to adopt the Agency-Modified Alternative was arbitrary and capricious because the alternative did not satisfy the criteria under the MMRA.

¶10 In response, the Appellants argued that MEIC should be collaterally estopped from contending that Article IX, Section 2 of the Montana Constitution and the MMRA require full reclamation of disturbed lands because that issue had been previously litigated in *Montana Environmental Information Center v. Montana Department of Environmental Quality*, 2011 Mont. Dist. LEXIS 99 (5th Jud. Dist. Ct. June 30, 2011) (hereinafter, *MEIC I*). In *MEIC I*, MEIC filed suit against the DEQ and GSM in the Fifth Judicial

8

District Court, challenging the DEQ's adoption of its reclamation plan regarding a large open pit mine also located at GSM's mine near Whitehall. The parties refer to this open pit mine as the Mineral Hill Pit. As in the present case, MEIC claimed that the reclamation plan was unlawful under the Montana Constitution and the MMRA. Similarly, MEIC argued that Article IX, Section 2 of the Montana Constitution and the MMRA require all land disturbed by mining operations to be "fully reclaimed" to its previous condition. MEIC likewise sought a legal declaration that to the extent the MMRA "allows less than full reclamation" the statute was in violation of this constitutional provision.

¶11    The District Court disagreed with MEIC in *MEIC I*, holding that Article IX, Section 2 of the Montana Constitution does not require disturbed land to be returned to its previous condition. Instead, the District Court concluded that the constitutional standard by which legislative actions are measured under Article IX, Section 2 of the Montana Constitution is whether the Legislature has provided "reasonable" standards for the reclamation of disturbed lands. Citing the language of the Montana Constitution, the transcripts from the 1972 Constitutional Convention, and a lack of precedent from this Court indicating that reclamation is a fundamental right, the court explained that the constitutional provision "provide[s] a guide for the legislature" and that the "legislature is authorized to do that which is reasonable" under the provision. MEIC did not appeal the District Court's decision in *MEIC I*.

9

¶12    In the present case, based on its conclusion in *MEIC I*, the District Court held that MEIC was estopped from relitigating the question of whether Article IX, Section 2 of the Montana Constitution and the MMRA require land disturbed by the taking of natural resources to be fully reclaimed to its previous condition. The court explained that in *MEIC I* it "squarely rejected MEIC's argument that '[Article IX, Section 2 of the Montana Constitution] requires restoration of the ground to its previous condition.'" The court further explained that in *MEIC I* it expressly "held that this provision provides a 'guide for the legislature'" and "empowers the legislature to 'do that which is reasonable.'" After determining that "[c]ollateral estoppel precludes MEIC from arguing that the MMRA is unconstitutional to the extent that it did not require restoration of the ground to its previous condition," the court concluded that the Agency-Modified Alternative satisfied the criteria under the MMRA.

## STANDARD OF REVIEW

¶13    We review a district court's ruling on motions for summary judgment de novo. *Gibbs v. Altenhofen*, 2014 MT 200, ¶ 8, 376 Mont. 61, 330 P.3d 458. Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file," together with any affidavits, demonstrate that no genuine issue exists as to any material fact and that the moving party is entitled to judgment as a matter of law. *Dewey v. Stringer*, 2014 MT 136, ¶ 6, 375 Mont. 176, 325 P.3d 1236. The availability of collateral estoppel and the preclusive effect of a prior judgment are also

10

reviewed de novo. *Brilz v. Metro. Gen. Ins. Co.*, 2012 MT 184, ¶ 13, 366 Mont. 78, 285 P.3d 494.

¶14 We review an agency's decision not classified as a contested case under the Montana Administrative Procedure Act[1] using the same standard as the district court. We determine whether the agency decision was "arbitrary, capricious, unlawful, or not supported by substantial evidence." *Clark Fork Coal. v. Mont. Dep't of Envtl. Quality*, 2008 MT 407, ¶ 21, 347 Mont. 197, 197 P.3d 482. In making this inquiry, "we consider whether the decision was 'based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Clark Fork*, ¶ 21 (quoting *North Fork Pres. Ass'n v. Dep't of State Lands*, 238 Mont. 451, 465, 778 P.2d 862, 871 (1989)). Although our review of an agency decision is narrow, we will not "automatically defer to the agency 'without carefully reviewing the record and satisfying [our]selves that the agency has made a reasoned decision.'" *Clark Fork*, ¶ 21 (quoting *Friends of the Wild Swan v. DNRC*, 2000 MT 209, ¶ 28, 301 Mont. 1, 6 P.3d 972).

## DISCUSSION

¶15 *1. Whether MEIC is precluded from relitigating the issue of whether Article IX, Section 2 of the Montana Constitution requires land disturbed by the taking of natural resources to be fully reclaimed to its previous condition.*

¶16 Issue preclusion (collateral estoppel) bars a party from relitigating an issue already decided in prior litigation. *Baltrusch v. Baltrusch*, 2006 MT 51, ¶ 15, 331 Mont. 281,

---

[1] "Contested case" denotes a "proceeding before an agency in which a determination of legal rights, duties, or privileges of a party is required by law to be made after an opportunity for hearing." Section 2-4-102(4), MCA. All parties to this action agree that this is not a contested case within the meaning of § 2-4-102(4), MCA.

11

130 P.3d 1267. The doctrine ensures that "once a court decides an issue of fact or law necessary to its judgment, that decision precludes relitigation of the same issue in a different cause of action between the same parties." *Brilz*, ¶ 18. Issue preclusion serves dual purposes. First, it protects the interests of litigants by "reliev[ing] parties of the expense and vexation of multiple lawsuits." *Brilz*, ¶ 18. Second, it promotes judicial economy by "prevent[ing] parties from incessantly waging piecemeal, collateral attacks against judgments." *Baltrusch*, ¶ 15. In substantively considering whether the issues are the same in the former and present actions, we do not equate an issue with "elements of a cause of action." Rather, "the bar that arises from collateral estoppel extends to all questions essential to the judgment and actively determined by a prior valid judgment." *McDaniel v. State*, 2009 MT 159, ¶ 33, 350 Mont. 422, 208 P.3d 817.

¶17 We apply a four-element test to determine whether relitigation of an issue is barred:

> 1. Was the issue decided in the prior adjudication identical to the issue raised in the action in question?
>
> 2. Was there a final judgment on the merits in the prior adjudication?
>
> 3. Was the party against whom preclusion is now asserted a party or in privity with a party to the prior adjudication?
>
> 4. Was the party against whom preclusion is now asserted afforded a full and fair opportunity to litigate the issue which may be barred?

*Omimex Can., LTD. v. State*, 2015 MT 102, ¶ 13, 378 Mont. 490, 346 P.3d 1125 (citing *McDaniel*, ¶ 28). The parties agree that the final three elements of the issue preclusion test are satisfied. Further, the parties do not dispute that in *MEIC I* MEIC directly

12

presented the District Court with the question of whether Article IX, Section 2 of the Montana Constitution requires disturbed land to be restored to its previous condition, and that the court "squarely rejected" this argument. MEIC thus focuses on the first element—whether the issue is identical—and advances two arguments in support of its contention that the issue in *MEIC I* is not identical to the issue in the present action. First, MEIC argues that the legal issue here and the legal issue in *MEIC I* are different because the constitutional standard it advanced in *MEIC I* is not the standard its puts forth in the current litigation. Second, MEIC argues that factual differences in the two actions create different issues. We address MEIC's arguments in turn.

¶18   MEIC begins by arguing that the District Court's holding entirely "misses the point" with respect to its constitutional argument in this case, contending that, contrary to the District Court's understanding, MEIC did not argue that Article IX, Section 2 of the Montana Constitution requires land disturbed by the taking of natural resources to be fully reclaimed to its previous condition. Instead, MEIC maintains that its argument here and in the District Court below is that the Constitution requires the "DEQ to choose the most effective reclamation alternative" and the "Backfill Alternative most effectively reclaims the land disturbed by the North Area Pit."

¶19   The Appellees respond that the legal issue here is the same as the legal issue in *MEIC I* and MEIC is attempting on appeal to reframe the same constitutional argument it made in *MEIC I* in order to avoid issue preclusion. The Appellees argue that the constitutional standard MEIC has offered "has been somewhat of a moving target during

13

the course of the GSM litigation." Appellees observe that in the District Court MEIC argued that the Constitution requires "full reclamation," but on appeal MEIC argues that the Constitution requires the "most effective reclamation alternative." The Appellees maintain the legal issue nevertheless remains the same: "whether the Constitution requires [full] restoration of land disturbed by natural resource extraction."[2]

¶20    We agree with the Appellees that MEIC raised the same legal issue in *MEIC I* that it raises in the present action. We have explained that a "litigant cannot avoid preclusion simply by reframing the same issues or raising novel contentions." *Baltrusch*, ¶ 25. If this were the case, "a party could escape the preclusive effect of an adverse judgment" in every case by using different language to describe the same argument. *B&B Hardware, Inc. v. Hargis Indus.*, __U.S.__, 135 S. Ct. 1293, 1308 (2015). While MEIC couches its argument on appeal in terms of the "most effective" reclamation alternative, MEIC stated in its complaint in the present action, as it did in *MEIC I*, that Article IX, Section 2 of the Montana Constitution requires "full reclamation." Similarly, in both complaints, MEIC sought a legal declaration that to the extent the MMRA "allows less than full reclamation" the MMRA is unconstitutional. Further, MEIC argues on appeal that the DEQ cannot constitutionally choose a reclamation alternative that "reclaims less land" than another alternative. Although MEIC's argument can certainly be stated in any number of different ways, the constitutional standard MEIC advocated for in *MEIC I* and

---

[2] The parties use the term "restoration" to denote full reclamation.

the constitutional standard that it advocates for in the present litigation are indistinguishable.

¶21 Moreover, even if we were to accept MEIC's assertion that it is offering a different constitutional standard than it offered in *MEIC I*, MEIC would still be precluded from advancing it because MEIC could have raised that different legal theory in the former litigation. We have explained that merely because a litigant advances a new contention in a second action, it does not necessarily follow that the new contention is exempt from preclusion. *Haines Pipeline Constr. v. Mont. Power Co.*, 265 Mont. 282, 288-89, 876 P.2d 632, 636-37 (1994). "'If a new legal theory or factual assertion put forward in the second action is related to the subject-matter and relevant to the issues that were litigated and adjudicated previously, so that it *could* have been raised, the judgment is conclusive on it despite the fact that it was not in fact expressly pleaded or otherwise urged.'" *McDaniel*, ¶ 33 (quoting *Haines*, 265 Mont. at 288-89, 876 P.2d at 636-37) (emphasis in original).

¶22 In *MEIC I*, MEIC pressed the District Court to decide the constitutional standard under Article IX, Section 2 of the Montana Constitution. MEIC could have pleaded or otherwise urged the District Court to adopt whatever constitutional standard it believed to be appropriate. It elected to argue that the Constitution requires disturbed land to be restored to its previous condition. The District Court disagreed with MEIC, holding instead that the Constitution requires that the statutory scheme achieve "reasonable" reclamation. MEIC now attempts to challenge that determination in a separate action

15

involving the same parties, contending that the "Constitution does not direct the legislature to enact 'reasonable' standards," and that such an interpretation is "hollow" and a "dead letter." MEIC had an opportunity to make this argument and challenge the District Court's determination by appealing the court's decision in *MEIC I* to this Court. For whatever reason, MEIC did not do so. Issue preclusion now prevents MEIC from raising the same issue with respect to the North Area Pit that it raised, and lost, with respect to the Mineral Hill Pit. In *MEIC I*, the District Court conclusively addressed the constitutional standard under Article IX, Section 2 of the Montana Constitution.

¶23 We next turn to MEIC's argument that it can avoid issue preclusion because of the factual differences between the Mineral Hill Pit and the North Area Pit. MEIC asserts that the "two pits are materially different," and that these factual differences have legal significance, thereby preventing the issues from being the same. We disagree.

¶24 Issue preclusion applies with equal force to both issues of law and issues of fact. In cases involving the same issues of law, issue preclusion is appropriate when the factual differences between the two actions "are of no legal significance whatever in resolving the issue presented in both cases." *United States v. Stauffer Chem. Co.*, 464 U.S. 165, 174, 104 S. Ct. 575, 579 (1984). *Accord Pacific Power & Light Co. v. Mont. Dep't of Revenue*, 246 Mont. 398, 404, 804 P.2d 397, 401 (1991). The United States Supreme Court's decision in *Stauffer* and this Court's decision in *Pacific Power* provide clear illustrations of the category of cases, in which the present case falls, where the party opposing the preclusive effect of collateral estoppel sought to relitigate legal issues in

16

which the different facts of the underlying litigation and the former litigation were not legally significant in determining the issue presented.

¶25 In *Stauffer*, the United States Supreme Court addressed whether the Environmental Protection Agency (EPA) could relitigate the issue of whether private contractors are "authorized representatives" as that term is used in the Clean Air Act. *Stauffer*, 464 U.S. at 166, 104 S. Ct. at 576. In previous litigation, *Stauffer Chemical Co. v. EPA*, 647 F.2d 1075 (10th Cir. 1981) (hereinafter, *Stauffer I*), private contractors from the EPA attempted to conduct an inspection of one of Stauffer's phosphate plants in Wyoming, but Stauffer refused to allow them to enter the plant. In *Stauffer I*, Stauffer argued that he did not need to permit the contractors entry because private contractors are not "authorized representatives" under the Clean Air Act for purposes of conducting inspections. The district court agreed, and the Tenth Circuit Court of Appeals affirmed. In a subsequent action filed in the United States District Court for the Middle District of Tennessee, *Stauffer Chemical Co., v. EPA*, 511 F. Supp. 744 (M.D. Tenn. 1981) (hereinafter, *Stauffer II*), the EPA attempted to inspect one of Stauffer's chemical plants in Tennessee using different private contractors than the ones used in *Stauffer I*. Stauffer again refused to allow entry to the private contractors and argued that the EPA should be estopped from relitigating the issue of whether private contractors are authorized representatives under the Clean Air Act based on the Tenth Circuit's decision in *Stauffer I*. The Sixth Circuit agreed, holding that the EPA was collaterally estopped by *Stauffer I* from relitigating the same question against Stauffer. The United States Supreme Court

17

upheld the Sixth Circuit's decision, concluding that, while the two suits involved two completely different occurrences at different plants located in different States, the "authorized representative" issue was the same in *Stauffer I* and *Stauffer II*. *Stauffer*, 464 U.S. at 170, 104 S. Ct. at 578. The Court explained that "[a]ny factual differences between the two cases, such as the difference in the location of the plants and the difference in the private contracting firms involved, are of no legal significance whatever in resolving the issue presented in both cases." *Stauffer*, 464 U.S. at 172, 104 S. Ct. at 579. Thus, the Court determined the EPA was collaterally estopped from relitigating whether private contractors are "authorized representatives" under the Clean Air Act, despite factual differences in the plants and the particular private contractors utilized for inspections. *Stauffer*, 464 U.S. at 174, 104 S. Ct. at 580.[3]

¶26    Similarly in *Pacific Power*, this Court addressed whether public utility owners could relitigate the issue of whether beneficial use taxes on the utility owners were unconstitutional under the Commerce Clause. *Pacific Power*, 246 Mont. at 404, 804 P.2d at 401. In previous litigation, the Court had held that the beneficial use taxes were constitutional for the year 1984. However, the utility owners argued that issue preclusion

---

[3]    MEIC contends that under the general rule of issue preclusion the facts must be "virtually identical" in the two actions to preclude relitigation of an issue under *Stauffer*. MEIC misreads *Stauffer*. While the United States Supreme Court did make reference to "virtually identical" facts in *Stauffer*, it did so in the context of an exception to the general rule of issue preclusion known as the "unmixed question of law" exception. In *Stauffer*, the Supreme Court acknowledged that "the exception is generally recognized" but was "frank to admit uncertainty as to its application." *Stauffer*, 464 U.S. at 171, 104 S. Ct. at 579. Similarly, other courts have recognized the "'unmixed question of law' exception is not easily summarized." *AMTRAK v. Pa. PUC*, 288 F.3d 519, 530 (3d Cir. 2002). Here, however, unlike the EPA in *Stauffer*, MEIC has failed to develop an argument under the ill-defined exception. Thus, we decline to address whether the "unmixed question of law" exception is applicable in this instance.

did not bar their suit because the present action involved different tax years, namely 1985, 1986, and 1987. *Pacific Power*, 246 Mont. at 404, 804 P.2d at 401. This Court rejected the owners' argument, concluding that the "fact that different tax years are being challenged makes no difference" in resolving the constitutional issue presented in both cases. *Pacific Power*, 246 Mont. at 404, 804 P.2d at 401. We explained:

> The constitutional challenges remain the same, and it is the substance of these challenges that have failed. The year in which they were brought has no bearing upon their lack of success. Allowing the [utility owners] to raise the *same* challenges to the *same* tax each subsequent tax year serves no purpose.

*Pacific Power*, 246 Mont. at 404, 804 P.2d at 401 (emphasis in original). Thus, we precluded the utility owners from relitigating the legal issue. *Pacific Power*, 246 Mont. at 405, 804 P.2d at 401.

¶27 The present case fits comfortably into the framework provided by *Stauffer* and *Pacific Power*. Here, like the parties opposing issue preclusion in *Stauffer* and *Pacific Power*, MEIC seeks to relitigate a legal issue in which any factual differences between the former and the current action are of no legal significance whatsoever in resolving the legal issue presented in both cases. Just as the difference in the contracting firms and location of the plants in *Stauffer* and the difference in the year in which the constitutional challenge was brought in *Pacific Power* were irrelevant to the issues presented in those cases, the difference in the physical characteristics of the North Area Pit and the Mineral Hill Pit are wholly immaterial to the legal issue presented here. MEIC does not, nor could it, seriously contend that the constitutional issue—whether Article IX, Section 2 of

19

the Montana Constitution requires land disturbed by the taking of natural resources to be restored to its previous condition—turns on geography, location, size, or any other physical characteristic of the two pits. Indeed, in making its constitutional argument, MEIC relies on the language of Article IX, Section 2 of the Montana Constitution, the jurisprudence of this Court, and the transcripts from the 1972 Constitutional Convention, not the physical characteristics of the two pits. Like the utility owners' challenge in *Pacific Power*, MEIC's constitutional argument remains the same, and any factual distinctions are without legal significance. The District Court has already "squarely rejected" MEIC's argument that the Montana Constitution requires restoration of the ground to its previous condition. Allowing MEIC to relitigate the issue of full reclamation would frustrate the collateral estoppel doctrine and defeat its purpose of protecting litigants from burdensome relitigation and of promoting judicial economy.

¶28 In sum, MEIC pressed the District Court in *MEIC I* to decide the constitutional standard by which legislative actions are measured under Article IX, Section 2 of the Montana Constitution. The District Court did so. Because that issue was specifically raised, litigated, and decided by the District Court in the former litigation in *MEIC I* in which the DEQ and GSM were parties, MEIC is barred by the doctrine of issue preclusion from raising the issue again for consideration by the District Court. We hold that the District Court did not err by precluding MEIC from relitigating whether Article IX, Section 2 of the Montana Constitution requires land disturbed by the taking of natural resources to be fully reclaimed to its previous condition.

20

¶29    *2. Whether MEIC is precluded from relitigating the issue of whether the Montana Metal Mine Reclamation Act requires land disturbed by the taking of natural resources to be fully reclaimed to its previous condition.*

¶30    MEIC is similarly precluded from relitigating whether the MMRA requires land disturbed by the taking of natural resources to be fully reclaimed to its previous condition.  First, our rationale for precluding MEIC from raising its constitutional challenge applies with equal force to MEIC's statutory argument.  In *MEIC I*, the District Court considered and rejected the same legal argument that MEIC makes here—that the MMRA requires the DEQ to choose the most effective reclamation alternative because Article IX, Section 2 of Montana Constitution requires as much.  Similarly, here, MEIC maintains that the factual differences between the Mineral Hill Pit and the North Area Pit create different issues.  As explained above, any factual variations between the two pits are legally insignificant to resolving the issue presented in both cases—whether the MMRA requires land disturbed by the taking of natural resources to be fully reclaimed to its previous condition.

¶31    Second, even if MEIC had not advanced its statutory argument in *MEIC I*, our conclusion with respect to Issue 1 precludes review of this issue as well.  Issue preclusion operates to preclude a party from advancing an issue in a current action even though the party did not advance that issue in the former "when the issues are so intertwined that to decide the issue before it, the District Court would have to rehear the precise issue previously decided."  *Baltrusch*, ¶ 25 (quoting *Martelli v. Anaconda-Deer Lodge County*, 258 Mont. 166, 169, 852 P.2d 579, 581 (1993)) (ellipsis, internal quotation marks, and

21

brackets omitted). Here, MEIC's statutory argument is entirely premised on its constitutional argument and the two arguments are so intertwined that the District Court would have to revisit the constitutional issue to decide the statutory issue. Because we affirmed the District Court's conclusion to preclude MEIC from relitigating the constitutional standard, MEIC's statutory argument is necessarily precluded as well. We hold that the District Court did not err by precluding MEIC from relitigating whether the MMRA requires land disturbed by the taking of natural resources to be fully reclaimed to its previous condition. Our conclusion on this Issue, however, does not preclude MEIC from challenging the DEQ's application of the MMRA's statutory criteria to the facts of the North Area Pit.

¶32 *3. Whether the DEQ made a reasoned decision in selecting the Agency-Modified Alternative under the criteria set forth in the Montana Metal Mine Reclamation Act.*

¶33 MEIC argues that the DEQ's decision to select the Agency-Modified Alternative is unsupported by the evidence under the criteria set forth in the MMRA. Pursuant to § 82-4-336(9)(b), MCA, of the MMRA "a reclamation plan must provide sufficient reclamation to a condition: (i) of stability structurally competent to withstand geologic and climatic conditions without significant failure that would be a threat to public safety and the environment; (ii) that affords some utility to humans or the environment; (iii) that mitigates postreclamation visual contrasts between reclamation lands and adjacent lands; and (iv) that mitigates or prevents undesirable offsite environmental impacts."

¶34 In both the final EIS and the ROD, the DEQ extensively analyzed the Agency-Modified Alternative in light of the MMRA criteria set forth in § 82-4-336(9)(b),

22

MCA. Beginning with the first condition, the DEQ concluded that "[w]hile the North Area Pit Backfill Alternative would provide better structural stability, no highwall failures would occur under any of the alternatives that would threaten public safety or the environment outside the pit." To ensure public safety within the North Area Pit, the DEQ required that GSM install fencing and monitor ground-movement after closure of the mine under the Agency-Modified Alternative. The DEQ concluded that with these precautionary measures "[m]inor raveling and small wall failures could occur over time but would not present a risk to human health or the environment." To better afford utility to the environment, the DEQ required GSM to place growth media on the pit benches to support establishment of vegetation and to plant tree seedlings on the berms and benches. The revegetated portions of the North Area Pit will total approximately 22 acres, which the DEQ concluded will provide wildlife habitat for a number of animal species, including the Black-tailed Prairie Dog, the Fringed Myotis, and the Hoary Bat. To mitigate postreclamation visual contrasts between reclaimed lands and adjacent lands, the DEQ required GSM to plant shrubs and trees on accessible benches in the highwalls that are visible from outside of the North Area Pit. The DEQ concluded that the "planting and seeding of benches will reduce the visual contrast between the highwall areas and adjacent undisturbed topography."

¶35 Lastly, the DEQ addressed the potential for undesirable offsite impacts, specifically the potential impact associated with contaminated groundwater. The DEQ concluded that with the installation of an underground sump pump the Agency-Modified

23

Alternative "provided adequate assurance that pollution of the Jefferson River alluvial aquifer and surface water in the Jefferson River Slough in violation of water quality laws would not occur." The DEQ found that "if the external dewatering wells were to fail, they could be replaced before the water table rebounds and impacted water begins discharging from the North Area Pit." The DEQ found that "[g]iven the capacity of the underground sump," the flow of impacted groundwater "will not exceed the design capacity of the sump." The DEQ explained that under the Agency-Modified Alternative even if the external dewatering wells were to fail "no impacts to groundwater or surface water outside the pit are anticipated because impacted groundwater would be captured by the underground sump and not flow from the pit." Thus, the DEQ concluded that the Agency-Modified Alternative provided better assurances against ground water contamination than the Backfill Alternative.

¶36 The DEQ's decision was based on consideration of the relevant factors set forth in § 82-4-336(9)(b), MCA, of the MMRA, and was not arbitrary, capricious, unlawful, or unsupported by substantial evidence. Therefore, we cannot conclude that the DEQ made a clear error of judgment, and we are satisfied that the DEQ made a reasoned decision in selecting the Agency-Modified Alternative. The District Court did not err by upholding the DEQ's decision.

¶37 Affirmed.

/S/ LAURIE McKINNON

24

We concur:

/S/ MIKE McGRATH
/S/ JIM RICE
/S/ PATRICIA COTTER
/S/ BETH BAKER