FILED

12/08/2020

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 19-0492

DA 19-0492

IN THE SUPREME COURT OF THE STATE OF MONTANA

2020 MT 303

PARK COUNTY ENVIRONMENTAL COUNCIL
and GREATER YELLOWSTONE COALITION,

Plaintiffs and Appellees,

v.

MONTANA DEPARTMENT OF ENVIRONMENTAL
QUALITY and LUCKY MINERALS, INC.,

Defendants and Appellants,

and

STATE OF MONTANA, by and through the
Office of the Attorney General,

Intervenor and Appellant.

APPEAL FROM:    District Court of the Sixth Judicial District,
In and For the County of Park, Cause No. DV-17-126
Honorable Brenda Gilbert, Presiding Judge

COUNSEL OF RECORD:

For Appellant Department of Environmental Quality:

Edward Hayes (argued), Special Assistant Attorney General, Department of
Environmental Quality, Helena, Montana

For Appellant Lucky Minerals, Inc.:

KD Feeback (argued), Toole & Feeback, PLLC, Lincoln, Montana

For Intervenor and Appellant State of Montana:

Timothy C. Fox, Montana Attorney General, Matthew T. Cochenour,
Acting Solicitor General, Rob Cameron (argued), Deputy Attorney General,
Jeremiah Langston, Assistant Attorney General, Helena, Montana

For Appellees:

Jenny K. Harbine (argued), Earthjustice, Bozeman, Montana

Argued and Submitted: September 30, 2020

Decided: December 8, 2020

Filed:

_____
Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1     Montana Department of Environmental Quality, Lucky Minerals, Inc., and intervenor Montana Attorney General Tim Fox appeal from a May 23, 2018 ruling granting summary judgment to Park County Environmental Council and Greater Yellowstone Coalition and an April 12, 2019 order of vacatur of the contested exploration license. We affirm in part, reverse in part, and remand to the Montana Department of Environmental Quality to conduct additional analysis consistent with this Opinion.

¶2     We address the following issues on appeal:

*Issue One: Whether Plaintiffs have standing to challenge the Department of Environmental Quality's issuance of an exploration permit to Lucky Minerals, Inc.*

*Issue Two: Whether the District Court erred in determining that the Department of Environmental Quality was required to evaluate the environmental impacts of potential full-scale mining on federal lands.*

*Issue Three: Whether the District Court erred in determining that the Department of Environmental Quality had not conducted an adequate analysis of the impacts of expected road improvements.*

*Issue Four: Whether the District Court erred in concluding that the Department of Environmental Quality failed to take a "hard look" at water quality issues.*

*Issue Five: Whether the District Court erred in determining that the Department of Environmental Quality failed to conduct a sufficient analysis of alternatives to exploration approval under the Montana Environmental Policy Act.*

*Issue Six: Whether the District Court erred in determining that § 75-1-201(6)(c) and (d), MCA, which bars equitable remedies for a Montana Environmental Policy Act violation, is unconstitutional under Article II, Section 3, and Article IX, Section 1, of the Montana Constitution.*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 Emigrant Gulch lies within of the Greater Yellowstone Ecosystem and is located just outside the Absaroka-Beartooth Wilderness. It is a mere 15 miles north of Yellowstone National Park and its watershed flows into the Yellowstone River, a world-renowned trout fishery. The Absaroka Mountains surrounding Emigrant Gulch are home to bighorn sheep, elk, deer, moose, marmots, coyotes, black bears, and wolves. Emigrant Gulch is within occupied grizzly bear and wolverine habitat as well as Canada lynx designated critical habitat. Emigrant Peak, the most prominent of the mountains flanking Emigrant Gulch, is a popular year-round recreation destination. At the mouth of Emigrant Gulch, residents and visitors have enjoyed the natural mineral pools of Chico Hot Springs for over 100 years. The region's natural beauty is also an important economic driver, supporting tourism that employs large numbers of Park County residents.

¶4 On February 17, 2015, Lucky Minerals, Inc. (Lucky) submitted an exploration license application seeking authorization under the Metal Mine Reclamation Act (MMRA), §§ 82-4-331-32, MCA, to conduct exploration activities within its privately-owned patented St. Julian mine claim block in Emigrant Gulch. Results from the proposed exploration would be used to model subsurface geology and associated mineralization. The St. Julian mine claim block is surrounded by the Custer Gallatin National Forest. Though the original proposal envisioned work on national forest lands, Lucky's revised proposal is for exploration only on its privately-owned patented claims on the St. Julian mine claim block. In its application, Lucky proposed to drill up to 46 holes—expected to average 1,000 feet in depth, with some potentially reaching as deep as 2,000 feet—from 23 drill

4

pads. The work would take place over the course of two field seasons, each anticipated to last from mid-July to mid-October. Lucky proposed using two drills running two ten-hour shifts per day, the night shift relying on light sources similar to those used by highway construction crews.

¶5 To reach Emigrant Gulch, one must traverse a forest service road that has suffered from rockslides and avalanches and is at times comparable to a Jeep trail not travelable by highway vehicles and best approached by ATV. Lucky's proposed exploration is expected to require the clearing of rocks and debris from the existing Forest Service road in order to access the drilling sight with vehicles and heavy equipment.

¶6 Pursuant to the Montana Environmental Policy Act (MEPA), found under Title 75, chapter one, MCA, the Montana Department of Environmental Quality (DEQ) released a draft Environmental Assessment (Draft EA) in response to Lucky's proposal on October 13, 2016. The Draft EA concluded that Lucky's proposed exploration would not result in significant environmental impacts.

¶7 However, the Draft EA did state that Lucky's proposed exploration would lead to an increase in wildlife disturbance, as road improvements intended to allow Lucky's mining equipment and vehicles to access Emigrant Gulch would also provide easier access for hunters, trappers, and others to enter habitat that has long been inaccessible to many. The Draft EA went on to describe the expected disturbance and displacement of grizzly bears and the potential for den abandonment by female wolverines. Scientific studies in the administrative record confirm that increased human presence in remote areas may have negative effects on wolverine and grizzly bear populations.

¶8    Among the more than 3,000 public comments made on the Draft EA, Montana Fish Wildlife & Parks (FWP) commented that the road improvements could "significantly increase[] [the] level of disturbance and fragmentation" of a presently "very remote and rarely disturbed" habitat. It warned of "a permanent change to the landscape, with long-term implications" for wildlife populations in the area, especially wolverine, lynx, grizzly bear, elk, deer, and moose. FWP recommended altering the project to avoid road improvements or reclaim/close the road after the project's completion.

¶9    On July 26, 2017, DEQ issued its Final Environmental Assessment (Final EA), maintaining that the project posed no significant environmental, and approved Lucky's proposal with slight modifications. In the Final EA, DEQ responded to FWP's comments regarding road improvements by noting that it had "re-evaluated the impact on wildlife resulting from the proposed road improvements and believes that the draft EA overstated the impacts." The Final EA concluded that the road work "may marginally make access to the area easier for hunters and may marginally increase higher mortality" for wildlife in addition to potentially increasing "the harassment or poaching of wildlife." However, DEQ did not expect the proposal to "materially change [the road's] character of an unimproved forest road."

¶10    The Final EA also outlined DEQ's detailed analysis of groundwater quality in the area. DEQ tested groundwater quality at a number of sites in the area, exhibiting a range of water chemistry values. DEQ determined that "[s]ome of the mineralized geologic materials in the Emigrant Mining District are potentially reactive and may produce acid rock drainage or mobilize metals under near-neutral pH conditions. Some water quality

6

samples within the district reflect the reactive nature of the geology . . . ." In particular, DEQ found elevated acidity and concentrations of Total Dissolved Solids (TDS) and sulfites in sights tested to the north of the East Fork of Emigrant Creek (East Fork), which drains the proposed exploration area. Though DEQ identified natural acid rock drainage occurring to the north of the East Fork, the agency concluded that the reactivity of that slope was due to a locally intense pyrite alteration that was not reflective of all subsurface materials in the East Fork drainage. The Final EA noted the presence of disseminated sulfides throughout the Emigrant Mining District deposits.

¶11 The Final EA also analyzed DEQ's groundwater testing on the south side of the East Fork, the same slope upon which the proposed exploration would occur. DEQ collected samples from a spring, two seeps, and three boreholes created during exploration conducted in 1971-73, known as the Duval Corporation Boreholes (Duval Boreholes). DEQ found minimal flow of less than five gallons per minute and no water quality standard exceedances at these sites, with relatively neutral pH values ranging from slightly acidic to slightly basic. DEQ concluded that the samples from the seeps and the Duval Boreholes "represent what is known about the groundwater flowing mid-slope on the south side of the East Fork." Although the "depths of the [Duval] [B]oreholes and the nature of the altered volcanics that were encountered are unknown," the Final EA found it "likely that [Lucky's] proposed boreholes could produce water with chemistry and flow similar to the Duval Corporation boreholes and the seeps below the St. Julian Mine."

¶12 The Final EA concluded that the expected artesian flow from Lucky's proposed drilling would, like the Duval Boreholes, result in "no discernible impact on water quantity

7

or quality in the East Fork of Emigrant Creek drainage, and even less so further downstream in Emigrant Gulch." Not only was the groundwater flowing out of the drill holes expected to be of acceptable quality and limited quantity, but DEQ determined that it could be contained. In addressing potential long term impacts of the proposed boreholes, the Final EA pointed to a regulatory provision (not in existence when the Duval Corporation created its boreholes in the 1970s) requiring Lucky to plug each hole prior to removing the drill rig. *See* Admin. R. M. 17.24.106 (1994). To address the impacts of the expected "artesian conditions" during drilling, the Final EA only noted that Lucky would be required to "develop a mitigation plan to effectively contain flow from artesian boreholes during drilling" and that "procedures for artesian flow containment would be developed prior to commencing drilling operations."

¶13 In the Final EA, DEQ briefly considered completing the exploration project within one year rather than two and eliminating night drilling as alternatives to Lucky's proposal. However, DEQ dismissed these alternatives without significant analysis based on the determination that the impacts would be substantially the same as those envisioned by Lucky's proposal. DEQ determined that, by compressing the exploration project into a single season, Lucky might need to use four drill rigs instead of two, with an attendant increase in traffic, noise, and lighting. Under the other alternative, abandoning night drilling, Lucky's operation could potentially minimize bat disturbances, but would result in the project requiring an additional three or four seasons to reach completion. In addition to a "No Action Alternative," DEQ also considered an "Agency-Modified Alternative" to Lucky's proposal containing minor mitigation measures. The Final EA did not address the

8

potential environmental impacts if Lucky were to use information gained from the proposed exploration to establish vested rights to conduct full scale mining in adjacent federal lands.

¶14 On September 22, 2017, Park County Environmental Council and Greater Yellowstone Coalition (collectively Council and Coalition) filed suit against DEQ and Lucky in the Sixth Judicial District Court, arguing that DEQ did not comply with the requirements of MEPA in producing its Final EA and finding of no significant environmental impact, thereby granting Lucky's exploration license without preparing a full environmental impact statement (EIS). The parties filed cross-motions for summary judgment and, after briefing and argument, the District Court issued a decision in favor of Council and Coalition on May 23, 2018.

¶15 The District Court determined that DEQ had failed to take a "hard look" at the effects of road improvements on grizzly bear and wolverine populations. The District Court also found that DEQ's water quality analysis fell short under MEPA. The District Court concluded that DEQ had "selectively relied upon" the Duval Borehole data while ignoring other, less optimistic, water quality data collected in the area. Furthermore, the District Court held that the Final EA provided only a "plan to make a plan" for Lucky to contain expected artesian flow during drilling. The District Court also concluded that DEQ failed to consider that Lucky's exploration could result in Lucky developing vested rights to mine on federal lands, constituting a "secondary impact" that required evaluation. Finally, the District Court determined that DEQ had given "unwarranted deference" to

Lucky's proposal and failed to conduct sufficient "independent analysis" of potential alternatives, such as the "no night drilling" and "one season" options.

¶16 On June 1, 2018, Council and Coalition filed a Motion for Vacatur of Exploration License in the Sixth Judicial District Court. The State of Montana, by and through the Attorney General, Timothy C. Fox (Attorney General) filed a Notice of Intervention on August 20, 2018. After briefing and oral argument, the District Court issued an order on April 12, 2019, granting the motion for vacatur and voiding Lucky's exploration license. The District Court concluded that the 2011 MEPA Amendments (2011 Amendments), § 75-1-201(c) and (d), MCA (2011 Mont. Laws ch. 396, § 2), which strip the judiciary of any remedy for a MEPA violation other than a remand to the agency, violated the guarantees of a clean and healthful environment, adequate remedies to prevent unreasonable degradation, and the right of public participation found in Article II, Section 3, Article IX, Section 1, and Article II, Section 8, of the Montana Constitution.

¶17 Lucky filed this appeal on August 27, 2019. Significantly, in March 2019, the United States Congress enacted a mineral withdrawal of the federal lands adjacent to Lucky's private claim block, rendering these lands permanently off limits to mining. John D. Dingell, Jr. Conservation, Management, and Recreation Act, Pub. L. No. 116-9, 133 Stat. 580 (2019).[1]

---

[1] On May 19, 2020, the Court requested supplemental briefing regarding the congressional withdrawal's effect on the District Court decision.

**STANDARD OF REVIEW**

¶18 A district court's grant or denial of summary judgment, and related conclusions of law, are reviewed de novo for correctness. *Bitterrooters for Planning, Inc. v. Mont. Dep't of Envtl. Quality*, 2017 MT 222, ¶ 15, 388 Mont. 453, 401 P.3d 712. This Court reviews DEQ's MEPA analysis using the same standard as a district court, determining whether the agency decision was "arbitrary, capricious, unlawful, or not supported by substantial evidence." *See Clark Fork Coal. v. Mont. Dep't. of Envtl. Quality*, 2008 MT 407, ¶ 21, 347 Mont. 197, 197 P.3d 482 (quotation omitted); *see also* § 75-1-201(6)(a)(iii), MCA. We inquire "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Clark Fork Coal.,* ¶ 21 (quotation omitted). Accordingly, this Court "looks closely" at agency decisions to determine whether the agency has taken a "hard look" by fulfilling its obligation to "make an adequate compilation of relevant information, to analyze it reasonably, and to consider all pertinent data." *Clark Fork Coal.*, ¶ 47. The Court's focus is on the administrative decision-making process rather than the decision itself. *Clark Fork Coal.*, ¶ 47. In general, agency decisions implicating "substantial agency expertise" are afforded "great deference." *Mont. Envtl. Info. Ctr. v. Mont. Dep't of Envtl. Quality*, 2019 MT 213, ¶ 20, 397 Mont. 161, 451 P.3d 493 (*MEIC III*) (citations omitted). Government actions that interfere with the exercise of a fundamental right are subject to strict scrutiny review. *See Mont. Envtl. Info. Ctr. v. Mont. Dep't of Envtl. Quality*, 1999 MT 248, ¶¶ 62-63, 296 Mont. 207, 988 P.2d 1236 (*MEIC I*).

**DISCUSSION**

¶19 *Issue One: Whether Plaintiffs have standing to challenge the Department of Environmental Quality's issuance of an exploration permit to Lucky Minerals, Inc.*

¶20 Lucky argues that Council and Coalition does not have the requisite standing to challenge DEQ's grant of an exploration permit to Lucky, alleging that its members have not demonstrated particularized injuries. To satisfy the constitutional requirements for standing, plaintiffs must "clearly allege a past, present, or threatened injury" that is "distinguishable from the injury to the public generally," and which can be "alleviated by successfully maintaining the action." *Heffernan v. Missoula City Council*, 2011 MT 91, ¶¶ 33, 360 Mont. 207, 255 P.3d 80 (citations omitted). Under the standing analysis, a judiciable injury may be to aesthetic or recreational interests. *See Heffernan*, ¶ 38 (finding property owner had standing where proposed development could decrease wildlife presence and increase traffic, noise, and pets); *Aspen Trails Ranch, LLC v. Simmons*, 2010 MT 79, ¶¶ 41-42, 356 Mont. 41, 230 P.3d 808 (finding landowner had standing to challenge subdivision allegedly expected to disrupt his enjoyment of the property through adverse impacts to the water supply, wildlife habitat, and wetlands in addition to causing increased noise, traffic, and light pollution); *MEIC I*, ¶ 45 (finding plaintiffs had standing to challenge action with arguably adverse impact on waterway in which they "fish and otherwise recreate"); *see also W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 484 (9th Cir. 2011).

¶21 Members of Council and Coalition filed affidavits demonstrating that, for years, they have variously hiked, climbed, skied, and biked in Emigrant Gulch, as well as owned

12

property in the area and maintained a business, Chico Hot Springs Resort, at the base of Emigrant Gulch. They allege that Lucky's activities will harm their recreational interests by disturbing wildlife habitat and scenic beauty, introducing industrial activity into a pristine wilderness, and threatening water quality, in addition to diminishing the value and enjoyment of their nearby properties and business. Members of Council and Coalition allege that harms would be caused not only by potential full-scale mining operations, but by Lucky's proposed exploration activities.

¶22 Members of Council and Coalition have clearly alleged a threatened injury to their property, recreational, and aesthetic interests. This injury is particularized to these and other individuals who live and recreate in and around the Emigrant Gulch and is not shared by the public at large. *See Aspen Trails Ranch*, ¶ 43 (concluding proximity to development demonstrated that impacts would have more particular effect on plaintiff than the general public). The alleged injury is the direct result of DEQ's approval of Lucky's exploration permit and could be alleviated by a successful action resulting in an order vacating the permit. These individuals meet the constitutional requirements for standing.

¶23 Associations have standing to assert the rights of their members:

> when (a) at least one of its members would have standing to sue in his or her own right, (b) the interests the association seeks to protect are germane to its purpose, and (c) neither the claim asserted nor the relief requested requires the individual participation of each allegedly injured party in the lawsuit.

*Mont. Immigrant Justice All. v. Bullock*, 2016 MT 104, ¶ 19, 383 Mont. 318, 371 P.3d 430 (citing *Heffernan*, ¶ 43).

13

¶24 Because Council and Coalition's members have standing to bring the suit in their own right and Lucky does not challenge the remaining elements of associational standing, we conclude that the District Court did not err in determining that Council and Coalition has standing to challenge DEQ's decision to issue Lucky an exploration permit without first producing an EIS.

¶25 *Issue Two: Whether the District Court erred in determining that the Department of Environmental Quality was required to evaluate the environmental impacts of potential full-scale mining on federal lands.*

¶26 DEQ and Lucky argue that the District Court erred in faulting DEQ for failing to consider the environmental impacts of full-scale mining in neighboring federal lands that could potentially occur as a result of the information gained during Lucky's proposed exploration activities. However, on March 12, 2019, after the District Court issued its decision, Congress placed these national forest lands permanently off-limits to future mining. *See* John D. Dingell, Jr. Conservation, Management, and Recreation Act, Pub. L. No. 116-9, § 1204, 133 Stat. 580, 653 (2019). Section 1204 of this legislation, titled "Emigrant Crevice Withdrawal," provides:

> (b) Withdrawal.—Subject to valid existing rights in existence on the date of enactment of this Act, the National Forest System land and interests in the National Forest System land, as depicted on the map, is withdrawn from—
> (1) location, entry, and patent under the mining laws; and
> (2) disposition under all laws pertaining to mineral and geothermal leasing.

Section 1204, 133 Stat. at 653.

¶27 According to Council and Coalition, this enactment foreclosed any potential full-scale mining by Lucky on neighboring federal lands. If so, then the issue of whether

14

DEQ should have analyzed the potential impacts of such activities is rendered moot. *Progressive Direct Ins. Co. v. Stuivenga*, 2012 MT 75 ¶ 17, 364 Mont. 390, 276 P.3d 867 ("[I]f the issue presented at the outset of the action has ceased to exist or is no longer 'live,'" the issue is moot.). A determination of mootness would preclude us from considering the issue further. *Plan Helena, Inc. v. Helena Reg'l Airport Auth. Bd.*, 2010 MT 26, ¶ 11, 355 Mont. 142, 226 P.3d 567 ("A court lacks jurisdiction to decide moot issues or to give advisory opinions insofar as an actual 'case or controversy' does not exist."). However, Lucky argues that it may still conduct full-scale mining on neighboring federal lands in the future, based on the contention that it has "valid existing rights in existence" on March 12, 2019, the date the congressional withdrawal was enacted. *See* § 1204, 133 Stat. at 653.

¶28 The U.S. Forest Service considered the issue of valid existing rights in a Draft Environmental Assessment that the Forest Service produced in preparation for a prior administrative withdrawal proposed for the same area:

> The process for determining valid existing rights must be conducted by a certified mineral examiner. The findings in the mineral examiners report would either (1) recognize that the claim(s) has valid existing rights and that the NOI or plan of operations should be processed, or (2) recommend initiating contest charges against the claim through the BLM, subject to their technical approval of the report. The process for determining valid existing rights is outside the scope of this environmental analysis.

U.S. Dep't of Agric. Forest Serv., *Emigrant Crevice Mineral Withdrawal Draft Environmental Assessment* 15 (2018).

¶29 This glimpse into federal mining law demonstrates that Lucky's aspirations for a full-scale mine depend in part on federal actors applying complex federal law. The

15

outcome of this process is both uncertain and beyond the authority of this Court. Because we cannot be certain that the Emigrant Crevice Withdrawal has completely precluded the possibility of an eventual full-scale mine, we cannot say that the issue of whether DEQ should have considered that possibility is moot.

¶30 In its May 23, 2018 decision made prior to the congressional withdrawal, the District Court found that DEQ was required to consider the potential for future full-scale mining as a "secondary impact" of the proposed exploration. The District Court voiced concern that the information gained from the proposed exploration could give rise to vested rights to mine national forest property under the Mining Act of 1872. *See* 30 U.S.C. § 26 (providing that "locators of all mining locations . . . [made] on any mineral vein, lode, or ledge . . . shall have the exclusive right of possession and enjoyment of . . . all veins, lodes, and ledges throughout their entire depth" though they may "depart from a perpendicular in their course downward as to extend outside the vertical side-lines"); *Wilderness Soc'y v. Dombeck*, 168 F.3d 367, 375 (9th Cir. 1999) (noting that mining rights on federal lands may be established by a "geologic inference" of a "reasonable likelihood of the persistence of similar mineralization beyond the areas actually sampled").

¶31 At its core, MEPA requires DEQ to engage in a prescribed level of environmental forecasting before taking an action impacting the environment. As we explained in *Bitterrooters for Planning*:

> MEPA requires an agency to produce a formal environmental impact statement (EIS) if an agency action will significantly affect the quality of the human environment. However, MEPA does not require an EIS if a preliminary EA determines that the agency action *will not significantly affect* the quality of the human environment. An EA thus serves as both the initial

16

tool for determining whether a more intensive EIS is necessary and as the mechanism for required environmental review of agency actions that will likely impact the environment but not sufficiently to require an EIS.

*Bitterrooters for Planning, Inc.*, ¶ 20 (citations omitted) (emphasis added). The critical issue here is whether, by granting a permit allowing exploration that could produce information potentially leading, in turn, to a full-scale mine on federal lands, DEQ has taken an agency action significantly affecting the environmental attributes of those federal lands. If so, DEQ would be required to consider those effects and, should they be found to be significant, prepare a detailed EIS with which to fully understand them.

¶32     In considering the degree to which an agency action will affect the quality of the human environment, an environmental assessment must include an evaluation of "secondary impacts," defined as "a further impact to the human environment that may be stimulated or induced by or otherwise result from a direct impact of the action." Admin. R. M. 17.4.603(18), .609(3)(d) (1989). However, MEPA "requires a reasonably close causal relationship between the triggering state action and the subject environmental effect." *Bitterrooters for Planning, Inc.*, ¶ 33. The critical point by which the required environmental review must have occurred is the "go/no go" juncture, beyond which lies an "irretrievable commitment of resources" or "successive steps set into irreversible motion." *North Fork Preservation Ass'n v. Dep't of State Lands*, 238 Mont. 451, 461-62, 778 P.2d 862, 868-69 (1989) (citing *Conner v. Burford*, 836 F.2d 1521, 1528 (9th Cir. 1988)).

¶33     Here, DEQ's decision to grant an exploration license to Lucky does not irreversibly set in motion a chain of events inevitably leading to a full-scale mine. Lucky is required to get another approval from DEQ prior to conducting any future mining operations.

Section 82-4-335(1), MCA.  DEQ's response would once again be governed by MEPA.  The "go/no go" point on any potential full-scale mining in the area has not yet been reached.  *See North Fork Preservation*, 238 Mont. at 462, 778 P.2d at 869 (finding that an EIS was not required before drilling exploratory well where oil and gas lease prohibited further activity until receiving state approval, such that full-scale drilling was not "a matter of successive steps set into irreversible motion by the issuance of the lease.").

¶34    Moreover, the Mining Act of 1872 does not preempt state environmental regulations.  *See Cal. Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 584, 107 S. Ct. 1419, 1426 (1987) (California Coastal Commission's requirement that claimant obtain a state permit to mine in national forests not preempted by federal regulations under the Mining Act of 1872); *see also Cal. Coastal Comm'n,* 480 U.S. at 603, 107 S. Ct. at 1436 (Powell, J., dissenting) ("[I]f the Coastal Commission can require Granite Rock to secure a permit before allowing mining operations to proceed, it necessarily can forbid Granite Rock from conducting these operations.").  Therefore, even if Lucky's exploration yields discoveries that grant Lucky rights under the Mining Act of 1872, DEQ will still have the final say before any future mining activities go forward.  By granting Lucky an exploration permit now, DEQ has not yet crossed an event horizon from which there is no return.  The point by which DEQ must consider the environmental impacts of a full scale mine will be if and when DEQ acts upon an application for a full scale mine.[2]

---

[2] Because we conclude that DEQ was not required to consider potential future mining on federal lands, we need not address DEQ's alternative argument that Council and Coalition was precluded from raising the issue by the doctrine of administrative issue exhaustion.

¶35    *Issue Three: Whether the District Court erred in determining that the Department of Environmental Quality had not conducted an adequate analysis of the impacts of expected road improvements.*

¶36    The District Court determined that DEQ had not taken a "hard look," as required under MEPA, at the impacts of Lucky's expected road work on wildlife in the area, particularly grizzly bears and wolverines. On appeal, DEQ does not defend its analysis on this matter and asks the Court to remand to DEQ to conduct supplemental environmental review on the issue. Though Lucky challenges the District Court decision and defends DEQ's initial analysis, "an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50, 103 S. Ct. 2856, 2870 (1983). Because DEQ has expressly chosen not to defend its own analysis of the proposed road improvements' impact on wildlife or to appeal the District Court's decision on the matter, but instead requests the opportunity to conduct supplemental review of the matter, we affirm the District Court's ruling to that effect and remand to DEQ for additional analysis.

¶37    *Issue Four: Whether the District Court erred in concluding that the Department of Environmental Quality failed to take a "hard look" at water quality issues.*

¶38    The District Court found that DEQ failed to take a "hard look" at relevant water quality data by over-relying on data from the Duval Boreholes while disregarding other sample sites with somewhat less benign water chemistry and evidence of geological materials with the potential to cause acid rock drainage in the area. DEQ denies having "cherry-picked" favorable evidence in its Final EA and claims to have reached its decision

19

by examining all available evidence and determining that the Duval Boreholes provided the most representative samples for predicting the impact of Lucky's proposed drilling.

¶39 The detailed analysis of DEQ's groundwater sampling in its Final EA convinces us that DEQ did take the requisite "hard look" at the relevant data before concluding that there would be no significant environmental impact from groundwater quality issues associated with Lucky's proposed exploration. The Final EA discussed how the results of groundwater sampling were correlated with their location in relation to the East Fork of Emigrant Creek. While samples taken from the north of the East Fork demonstrated potentially more troubling water chemistry, those taken from the south slope, the same slope upon which Lucky's proposed exploration would occur, did not exceed water quality standards. DEQ concluded that this variation was due to the presence of "locally-intense pyrite alteration" to the north of the East Fork and determined that the "acidic chemical signature is certainly not reflective of all subsurface materials in the East Fork of Emigrant Creek drainage."

¶40 The Final EA determined that, among the sites sampled to the south of the East Fork, "[i]n addition to the St. Julian Mine area seeps, the flowing Duval Corporation boreholes represent what is known about the groundwater flowing mid-slope on the south side of the East Fork." Although the "depths of the boreholes and the nature of the altered volcanics that were encountered are unknown," the Final EA found it "likely that the proposed boreholes could produce water with chemistry and flow similar to the Duval Corporation boreholes and the seeps below the St. Julian Mine." Based on this analysis, DEQ concluded that the expected flow from Lucky's proposed boreholes would result in

20

"no discernible impact on water quantity or quality in the East Fork of Emigrant Creek drainage, and even less so further downstream in Emigrant Gulch."

¶41 After analyzing groundwater samples collected from a variety of sites in the area, DEQ determined in its Final EA that the data collected from sites to the south of the East Fork was more predictive of groundwater conditions in the proposed exploration area than those sites to the north of the East Fork, which were affected by a locally intense pyrite alteration. Thus, DEQ has "articulate[d] a satisfactory explanation for its action, including a rational connection between the facts found and the choice made" and we cannot conclude that its decision was "arbitrary, capricious, unlawful, or not supported by substantial evidence." *Mont. Envtl. Info. Ctr. v. Mont. Dep't of Envtl. Quality*, 2016 MT 9, ¶ 14, 382 Mont. 102, 365 P.3d 454 (*MEIC II*); *Clark Fork Coal.*, ¶ 47. The depth of the analysis presented in the Final EA supports a conclusion that DEQ took the necessary "hard look" at the issue of ground water quality.

¶42 Council and Coalition points to a passage of a Montana Bureau of Mines and Geology report from 2000 describing the effect of the artesian flow from the Duval Boreholes at that time as "unknown and may be of some concern." Neither this expression of past uncertainty nor the existence of localized mineral formations in the area with the potential to create acidity undermines DEQ's current determination, after conducting a detailed groundwater analysis of the area, that Lucky's proposed boreholes are expected to share similarities with the Duval Boreholes and not significantly impact the environment.

¶43 The process of assigning relative weights to conflicting data for predictive purposes is essentially a technical exercise requiring agency expertise that should be afforded

21

substantial deference. *MEIC III*, ¶ 20 (agency decisions implicating "substantial agency expertise" are afforded "great deference"). The Court's role in these areas is limited. *Clark Fork Coal.*, ¶ 47. DEQ provided legitimate scientific reasons for its decision to rely on data from the Duval Boreholes. We conclude that the District Court erred in substituting its judgment for that of the agency regarding which samples were most predictive of the environmental impacts from Lucky's proposed boreholes.

¶44 However, DEQ concedes that the Final EA's requirement that Lucky develop a mitigation plan to contain artesian flow before commencing drilling—referred to by the District Court as a mere "plan to make a plan"—was insufficient and DEQ does not challenge the District Court finding on the matter. DEQ concedes that it should have, in its Final EA, identified and evaluated specific measures for Lucky to take before granting the exploration license and requests that the matter be remanded back to the agency to conduct supplemental environmental review on the issue. Therefore, we affirm the District Court decision to remand to DEQ to conduct supplemental review on the issue of containing artesian flow during drilling.

¶45 *Issue Five: Whether the District Court erred in determining that the Department of Environmental Quality failed to conduct a sufficient analysis of alternatives to exploration approval under the Montana Environmental Policy Act.*

¶46 DEQ challenges the District Court's conclusion that DEQ failed to conduct a sufficient independent analysis of reasonable alternatives by dismissing, without detailed analysis, modifications such as proceeding without night drilling or completing the exploration in one season rather than two. In its Final EA, DEQ concluded that these options would not substantially decrease the project's total environmental impacts but,

22

rather, would essentially simply spread out or concentrate them across a different length of time. DEQ concluded that preventing night drilling would extend the project on over the course of additional seasons while compressing the project into a single season would increase the intensity of environmental impacts during that time frame. As Council and Coalition points out, these conclusions contain a hidden premise: that a scaled down project with fewer drilling locations was not an option under consideration. The dispute here turns on whether DEQ is obligated to consider a scaled-down alternative to Lucky's proposal of creating 46 boreholes from 23 drill pads.

¶47 MEPA requires agencies to "study, develop, and describe appropriate alternatives to recommend courses of action in any proposal that involves unresolved conflicts concerning alternative uses of available resources." Section 75-1-201, MCA. One of the purposes of an EA is to "assist in the evaluation of reasonable alternatives," Admin. R. M. 17.4.607(2)(b) (1989), and an EA must contain "analysis of reasonable alternatives to a proposed action whenever alternatives are reasonably available and prudent to consider." Admin. R. M. 17.4.609(3)(f) (1989). Under MEPA, an alternative analysis is defined as an "evaluation of different parameters, mitigation measures, or control measures that would accomplish the same objectives as those included in the proposed action by the applicant. For a project that is not a state-sponsored project, it does not include an alternative facility or an alternative to the proposed project itself." Section 75-1-220(1), MCA.

¶48 Like the parties here, federal courts addressing the analogous National Environmental Policy Act (NEPA) are not in accord in determining the scope of the

23

relevant objectives, whether they are those held by the agency or by the applicant, and who they should be defined by. *See, e.g.*, *Nat'l Parks & Conservation Ass'n v. BLM*, 606 F.3d 1058, 1071-72 (9th Cir. 2010) (finding agency's purpose and need statement including three goals of the applicant and only one goal of the agency resulted in objectives being defined in unreasonably narrow terms); *Angoon v. Hodel*, 803 F.2d 1016, 1021 (9th Cir. 1986) (holding that the district court erred in adopting overly broad purpose and need— "commercial timber harvesting"—where applicant sought to build a specific timber transfer facility at a designated location (citation omitted)); *Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 73 (D.C. Cir. 2011) (determining that agency purpose "to act upon" applicant's proposal was not unreasonably narrow and permitted "a reasonable range of alternatives" in responding to the application, including by approving it, rejecting, or approving it with modifications); *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 199 (D.C. Cir. 1991) ("An agency cannot redefine the goals of the proposal" because "Congress did not expect agencies to determine for the applicant what the goals of the applicant's proposal should be."); *Alaska Survival v. Surface Transp. Bd.*, 705 F.3d 1073, 1085 (9th Cir. 2013) (finding that agency must consider the statutory context in addition to private applicant's objectives and act "in light of the goals stated by the applicant").

¶49    Part of the confusion appears to stem from the added layer of analysis that arises when an agency "acts upon"—usually  by approving, denying, or approving with modifications—an application by another party seeking to undertake its own action. *Compare Roosevelt,* 661 F.3d at 73 (discussing agency purpose as "to act upon" applicant's

24

proposal and characterizing the relevant alternatives as varying responses to the application) *with Burlington, Inc.*, 938 F.2d at 199 (characterizing the relevant objectives as defined by the applicant because an "agency cannot redefine the goals of the proposal"). The parties, likewise, disagree here over whether the proper subject of the alternatives analysis is the proposed actions of Lucky—to conduct exploration—or of DEQ—to respond to Lucky's proposal.

¶50    We conclude that MEPA does not require DEQ to attempt to define an applicant's objectives and raise alternatives to the applicant's proposed exploration project. The plain language of the statute requires alternatives analysis only for "major actions *of state government.*" Section 75-1-201(1)(iv), MCA (emphasis added). In the case of a project that is not state-sponsored, the statute makes clear that, while the applicant "may volunteer to implement" a proposed alternative, § 75-1-201(1)(v), MCA, the required alternatives analysis does "not include an alternative facility or *an alternative to the proposed project itself.*" Section 75-1-220(1), MCA (emphasis added). The obvious impracticalities of requiring DEQ to put itself in the shoes of each applicant to not only determine whether a proposed project will actually be feasible but also raise alternative approaches that may fail to yield essential information counsel against a strained interpretation to the contrary.

¶51    DEQ properly considered alternative means of reaching its own objective of "act[ing] upon Lucky Minerals' proposal"—namely, by approving, approving with modifications, or denying the application. In doing so, DEQ met its obligation under MEPA to consider alternatives. DEQ was not required by MEPA in this case to unilaterally determine whether Lucky could meet its exploration goals by creating fewer drillholes.

25

Therefore, we reverse the District Court's holding that DEQ failed to undertake a sufficient analysis of alternatives under MEPA.

¶52    *Issue Six: Whether the District Court erred in determining that § 75-1-201(6)(c) and (d), MCA, which bars equitable remedies for a Montana Environmental Policy Act violation, is unconstitutional under Article II, Section 3, and Article IX, Section 1, of the Montana Constitution.*

¶53    Because DEQ concedes that its analysis of road improvement impacts on wildlife and mitigation plans for expected artesian flow during drilling fell short under MEPA, we must now address the issue of appropriate remedies. DEQ asks, and we have agreed, that the matter be remanded to the agency to cure these shortcomings. The issue here centers around the status of Lucky's exploration license while DEQ proceeds to complete its MEPA review. Lucky and the Attorney General contest the District Court order vacating Lucky's exploration license in the interim, pointing to legislative amendments made to MEPA in 2011 (2011 Amendments) prohibiting equitable relief for a MEPA violation. Section 75-1-201(6)(c), (d), MCA (2011 Mont. Laws ch. 396, § 2). The District Court concluded that the 2011 Amendments violated the Montana Constitution's guarantee of a "clean and healthful environment" and its corollary obligation upon the Legislature to provide "adequate remedies to prevent unreasonable depletion and degradation of natural resources." Mont. Const., art. II, § 3, art. IX, § 1.

¶54    The Attorney General asks us to avoid the constitutional question and resolve the issue on statutory grounds instead by analyzing MEPA in light of other environmental statutes and noting its procedural nature. "[C]ourts should avoid constitutional issues whenever possible." *Sunburst Sch. Dist. No. 2 v. Texaco, Inc.*, 2007 MT 183, ¶ 62, 338

26

Mont. 259, 165 P.3d 1079. However, the doctrine of constitutional avoidance does not allow us to abandon our responsibility to resolve the disputes brought before us.

¶55 Here, DEQ has conceded that its Final EA was insufficient under MEPA and requests the opportunity to correct it. The judiciary's standard remedy for permits or authorizations improperly issued without required procedures is to set them aside. *See Citizens for Responsible Dev. v. Bd. of Cty. Comm'rs*, 2009 MT 182, ¶ 26, 351 Mont. 40, 208 P.3d 876; *Aspen Trails Ranch,* ¶ 59; *Kadillak v. Anaconda Co.*, 184 Mont. 127,144, 602 P.2d 147, 157 (1979); *see also Alsea Valley All. v. Dep't of Commerce*, 358 F.3d 1181, 1185-86 (9th Cir. 2004). Courts only decline to do so in "limited circumstances." *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015) (internal quotation omitted). The District Court correctly determined that equitable relief should be afforded to Council and Coalition if within the court's authority to grant. The 2011 Amendments to MEPA strip that authority. The judiciary will, of course, respect statutory mandates that are within the Legislature's constitutional authority. Whether Council and Coalition is entitled to the remedy sought here depends entirely upon whether the 2011 Amendments are valid under the Montana Constitution. The constitutional question is therefore unavoidable in resolving this dispute.

¶56 The Attorney General's suggestion—that we consider MEPA in light of other environmental statutes or its procedural nature—does not allow us to avoid determining whether the 2011 Amendments are constitutional. While these considerations might be helpful in answering the constitutional question, they provide no alternative means of resolving this dispute without *asking* it. Likewise, the doctrine of constitutional avoidance

27

does not allow us to, as suggested by the Attorney General, avoid the constitutional question by holding that Council and Coalition should have sought relief under another environmental statute, such as the MMRA.[3] Here, Lucky sought a permit to conduct extensive exploratory actions for determining the feasibility of fully developing a mine, and Council and Coalition contests the lawfulness of DEQ's response under MEPA. We will not avoid our responsibility to resolve the dispute actually before us by hypothesizing about whether other disputes might arise at a future time.

¶57    The 2011 Amendments to MEPA provide that:

> (c) The remedy in any action brought for failure to comply with or for inadequate compliance with a requirement of parts 1 through 3 of this chapter is limited to remand to the agency to correct deficiencies in the environmental review conducted pursuant to subsection (1).
> (d) A permit, license, lease, or other authorization issued by an agency is valid and may not be enjoined, voided, nullified, revoked, modified, or suspended pending the completion of an environmental review that may be remanded by a court.

Section 75-1-201(6), MCA. These provisions allow a project to go forward even when, as here, the agency has conceded that the project was approved without the proper environmental review required by MEPA. A court's only remedy under the 2011 Amendments is to remand to the agency to complete its review, with no ability to halt the project in the interim.

---

[3] Despite the Attorney General's repeated assertion that the MMRA provides Council and Coalition with an adequate alternative remedy, the Attorney General does not contend that Council and Coalition would have a valid claim under the MMRA, but, rather, suggested at oral argument that they would not.

¶58 Article II, Section 3, of the Montana Constitution guarantees Montanans inalienable rights that "include the right to a *clean and healthful environment* and the rights of pursuing life's basic necessities, enjoying and defending their lives and liberties, acquiring, possessing and protecting property, and seeking their safety, health and happiness in all lawful ways." Mont. Const., art. II, § 3 (emphasis added).

¶59 Significantly, Article IX, Section 1, of the Montana Constitution further provides:

> (1) The state and each person shall maintain and improve a clean and healthful environment in Montana for present and future generations.
> (2) The legislature shall provide for the administration and enforcement of this duty.
> (3) The legislature shall provide adequate remedies for the protection of the environmental life support system from degradation and *provide adequate remedies to prevent unreasonable depletion and degradation* of natural resources.

Mont. Const., art. IX, § 1 (emphasis added).

¶60 Laws implicating either constitutional provision are subject to strict scrutiny. *MEIC I*, ¶¶ 63-64. Here, neither Lucky nor the Attorney General argue that the 2011 Amendments would survive strict scrutiny review. Instead, they argue that the 2011 Amendments do not implicate the constitutional right or, alternatively, that the Court should apply a lower level of scrutiny by balancing these rights against the right to "possessing and protecting property." Mont. Const. art. II, § 3.

¶61 We turn first to the question of whether the 2011 Amendments implicate the Montana Constitution's environmental provisions. We considered these constitutional provisions at length in *MEIC I*, where the challenged statute created a blanket exemption for specified activities from water quality nondegradation review without regard to the

29

nature or volume of the substances being discharged. After a detailed review of the history of the 1972 Montana Constitutional Convention, we determined that the framers of the Montana Constitution intended it to contain "the strongest environmental protection provision found in any state constitution." *MEIC I*, ¶ 66. The delegates' adamant statements during the convention informed our conclusion that these provisions were meant to be "both anticipatory and preventative" and do "not require that dead fish float on the surface of our state's rivers and streams before [the Montana Constitution's] farsighted environmental protections can be invoked." *MEIC I*, ¶ 77. We determined that the exclusions violated fundamental rights and remanded to the District Court to determine whether the exclusions could survive strict scrutiny. *MEIC I*, ¶¶ 80-81.

¶62 Our conclusions in *MEIC I* are consistent with the constitutional text's unambiguous reliance on preventative measures to ensure that Montanans' inalienable right to a "clean and healthful environment" is as evident in the air, water, and soil of Montana as in its law books. Article IX, Section 1, of the Montana Constitution describes the environmental rights of "future generations," while requiring "protection" of the environmental life support system "from degradation" and "prevent[ion of] unreasonable depletion and degradation" of the state's natural resources. This forward-looking and preventative language clearly indicates that Montanans have a right not only to reactive measures after a constitutionally-proscribed environmental harm has occurred, but to be free of its occurrence in the first place.

¶63 Montanans' right to a clean and healthful environment is complemented by an affirmative duty upon their government to take active steps to realize this right. Article IX,

Section 1, Subsections 1 and 2, of the Montana Constitution command that the Legislature "shall provide for the administration and enforcement" of measures to meet the State's obligation to "maintain and improve" the environment. Critically, Subsection 3 explicitly directs the Legislature to "provide adequate remedies to prevent unreasonable depletion and degradation of natural resources." Mont. Const. art. IX, § 3.

¶64 When considering which remedies are "adequate" in this context, we note that equitable relief, unlike monetary damages, can avert harms that would have otherwise arisen. It follows that equitable relief must play a role in the constitutional directive to ensure remedies that are adequate to prevent the potential degradation that could infringe upon the environmental rights of present and future generations. We are not alone in this conclusion. As Delegate Mae Nan Robinson pointed out during the 1972 Constitutional Convention:

> if you're really trying to protect the environment, you'd better have something whereby you can sue or seek injunctive relief before the environmental damage has been done; it does very little good to pay someone monetary damages because the air has been polluted or because the stream has been polluted if you can't change the condition of the environment once it has been destroyed.

*MEIC I*, ¶ 71 (citing Montana Constitutional Convention, Verbatim Transcript, March 1, 1972, Vol. V 1230).

¶65 We turn now to MEPA's role in fulfilling this constitutional mandate. MEPA, which requires environmental review prior to government actions that may significantly affect the human environment, § 75-1-201, MCA, was enacted in 1971—just prior to the 1972 Constitutional Convention—with nearly unanimous support from across the political

31

spectrum.  *See generally* Legislative Environmental Policy Office, *A Guide to the Montana Environmental Policy Act*, 3 (2006), available at perma.cc/JM9N-CEM7.  MEPA's policy declaration provided that the State will pursue various ends consistent with a thoughtful relationship between the State and Montana's natural environment, including to:

> (a) fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;
> (b) assure for all Montanans safe, healthful, productive, and aesthetically and culturally pleasing surroundings;
> (c) attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences . . . .

Section 75-1-103(2), MCA (1971).  The provision went on: "The legislature recognizes that each person shall be entitled to a healthful environment and that each person has a responsibility to contribute to the preservation and enhancement of the environment." Section 75-1-103(3), MCA (1971).  According to MEPA's 1971 statement of purpose, MEPA would "promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man, to enrich the understanding of the ecological systems and natural resources important to the state."  Section 75-1-102, MCA (1971).

¶66    These statements of purpose and intent were subsequently amended several times, including in 1995 when the Legislature added language expressing a concern for protecting private property rights from "undue government regulation."  Section 75-1-102(2), 103(2)(d), MCA (1995 Mont. Laws ch. 352, §§ 1-2).  A 2003 amendment inserted language stating that the Legislature had enacted MEPA "mindful of its constitutional obligations under Article II, section 3 and Article IX of the Montana constitution," that MEPA "is

procedural," and that the purpose of environmental review is to ensure that "environmental attributes are fully considered." Section 75-1-102(1), MCA (2003 Mont. Laws ch. 361, § 5). The 2003 amendments also recognized that, in addition to the right to a healthful environment, each person has a right to "pursue life's basic necessities" and that the "implementation of these rights requires the balancing of the competing interests" in order "to protect the public health, safety, and welfare." Section 75-1-103(3), MCA (2003 Mont. Laws ch. 361, § 6). In 2011, MEPA's policy statement was amended to clarify that the purpose of environmental review under MEPA is to better enable the Legislature "to fulfill [its] constitutional obligations" and to "assist the legislature in determining whether laws are adequate to address impacts to Montana's environment and to inform the public and public officials of potential impacts resulting from decisions made by state agencies." Section 75-1-102(1)(a), (3)(a), MCA (2011 Mont. Laws ch. 396, § 1). The 2011 Amendments also contained the provisions at issue in this dispute, seeking to prevent the grant of equitable remedies for MEPA violations. Section 75-1-201(6)(c), (d), MCA (2011 Mont. Laws ch. 396, § 2).

¶67 We agree that MEPA serves a role in enabling the Legislature to fulfill its constitutional obligation to prevent environmental harms infringing upon Montanans' right to a clean and healthful environment. The Attorney General points to our language in the 1979 *Kadillak v. Anaconda Co.* decision as support for the opposite proposition. *Kadillak*, 184 Mont. 127, 602 P.2d 147 (1979). There, we held that an EIS was not necessary where the 60 days in which the agency was directed to act by the Hardrock Mining Act were too prohibitively few to allow for a comprehensive EIS to be prepared. *Kadillak*, 184 Mont.

33

at 138, 602 P.2d at 153. While seeking to interpret MEPA in a way reconcilable with the Hardrock Mining Act, we briefly addressed the Montana Constitution's environmental provisions and found:

> no indication that the MEPA was enacted to implement the new constitutional guarantee of a "clean and healthful environment." This Court finds that the statutory requirement of an EIS is not given constitutional status by the subsequent enactment of this constitutional guarantee. If the Legislature had intended to give an EIS constitutional status they could have done so after 1972.

*Kadillak*, 184 Mont. at 138, 602 P.2d at 154.

¶68　*Kadillak* is not persuasive here. Subsequent MEPA amendments made clear that the Legislature has shaped MEPA as a vehicle for pursuing its constitutional mandate. *See* § 75-1-102(2), 103(2)(d), MCA (1995 Mont. Laws ch. 352, §§ 1-2) (addressing constitutional property rights); § 75-1-102(1), MCA (2003 Mont. Laws ch. 361, § 5) (providing that Legislature had enacted MEPA "mindful of its constitutional obligations under Article II, section 3 and Article IX of the Montana constitution."); § 75-1-102(1)(a), (3)(a), MCA (2011 Mont. Laws ch. 396, § 1) (declaring the purpose of environmental review under MEPA to better enable the Legislature "to fulfill [its] constitutional obligations" and to "assist the legislature in determining whether laws are adequate to address impacts to Montana's environment"); *see also N. Plains Res. Council, Inc. v. Mont. Bd. of Land Comm'rs*, 2012 MT 234, ¶ 14, 366 Mont. 399, 288 P.3d 169 ("One of the ways that the Legislature has implemented Article IX, Section 1 is by enacting MEPA.").

¶69　The Montana Constitution's framers likely saw MEPA as an essential element of Legislative efforts to meet the government's newly-enshrined constitutional obligations.

34

MEPA's freshly enacted references to an individual right to a healthful environment—vested in present and future generations—and the State's role in preventing degradation and "unintended consequences" to that environment could not have been far from the minds of the delegates who convened in January of the following year to constitutionalize many of these very same environmental principles. The undeniable proximity in time and substance between these two lawmaking efforts informs our conclusion that the constitutional obligations at issue encompass the forward-looking mechanisms found within MEPA.

¶70 We agree that MEPA's role in fulfilling the Legislature's constitutional mandate is essentially procedural. *See* § 75-1-102(1), MCA; *Mont. Wildlife Fed'n v. Mont. Bd. of Oil & Gas Conservation*, 2012 MT 128, ¶ 32, 365 Mont. 232, 280 P.3d 877 ("MEPA is essentially procedural." (internal quotations omitted)). "Procedural," of course, does not mean "unimportant." The Montana Constitution guarantees that certain environmental harms shall be prevented, and prevention depends on forethought. MEPA's procedural mechanisms help bring the Montana Constitution's lofty goals into reality by enabling fully informed and considered decision making, thereby minimizing the risk of irreversible mistakes depriving Montanans of a clean and healthful environment. Therefore, the Legislature cannot fulfill its constitutional obligation to prevent proscribed environmental harms without some legal framework in place that mirrors the uniquely "anticipatory and preventative" mechanisms found in the original MEPA.

¶71 From the 1972 ratification of the Montana Constitution until 2011, MEPA performed an essential part of the Legislature's efforts to meet its constitutional obligations

by ensuring that information was gathered and carefully considered *before* committing to an action with potential to cause an environmental harm forbidden by the Constitution. While MEPA's text prior to 2011 did not explicitly provide for equitable remedies, such relief is generally appropriate for violations of the sort, *see Pollinator Stewardship Council*, 806 F.3d at 532, and this Court has granted injunctions for MEPA violations prior to the 2011 Amendments. *See, e.g.*, *Friends of the Wild Swan v. Dep't of Nat'l Res. & Conservation*, 2000 MT 209, 301 Mont. 1, 6 P.3d 972; *Montana Envtl. Info. Ctr. v. Montana Dep't of Transp.*, 2000 MT 5, ¶¶ 9-10, 28-29, 298 Mont. 1, 994 P.2d 676; *Montana Wilderness Ass'n v. Board of Health & Envtl. Sciences*, 171 Mont. 477, 516, 559 P.2d 1157, 1177 (1976). Thus, the 2011 amendments constituted a significant departure from MEPA as it existed since its enactment less than a year prior to Montana's Constitutional Convention.

¶72 Without a mechanism to prevent a project from going forward until a MEPA violation has been addressed, MEPA's role in meeting the State's "anticipatory and preventative" constitutional obligations is negated. Whatever interest might be served by a statute that instructs an agency to forecast and consider the environmental implications of a project that is already underway—perhaps analogous to a mandatory aircraft inspection after takeoff—the constitutional obligation to prevent certain environmental harms from arising is certainly not one of them.

¶73 Here, DEQ has conceded that it failed to conduct the level of review required by MEPA in determining whether to approve Lucky's exploration permit. This information gap occurred within the Greater Yellowstone Ecosystem and the Yellowstone River

36

watershed, in an area that is a mere 15 miles from the national park, home to important habitat for wildlife including grizzly bears and wolverines, and host to one of the most popular year-round recreation destinations in Montana[4] and a tourism-dependent human economy. The need for fully informed and considered decision making could hardly be more pressing.

¶74 DEQ requests a remand to correct this shortfall, gaining the information that it was required under MEPA to collect *prior* to making a permitting decision. However, under the 2011 Amendments, DEQ's early error is essentially irreversible, and the cost of that error will accrue to Montanans' constitutionally-guaranteed environmental rights. Presumably, one of Lucky's first orders of business in proceeding with the proposed exploration will be making improvements to the access road. FWP warned that this undertaking could create a "permanent change to the landscape, with long-term implications" for important wildlife by "significantly increas[ing the] level of disturbance and fragmentation" of a presently "very remote and rarely disturbed" habitat. The 2011 Amendments seek to allow Lucky to commence this work before DEQ completes supplemental review, a review that can be expected to achieve very little beyond informing Montanans—perhaps tragically—of the consequences of actions that have already been taken. Article IX, Section 1, of the Montana Constitution guarantees that the government will provide Montanans with remedies adequate to prevent unreasonable degradation of

---

[4] The region is one of the most popular destinations in the United States. In 2019, Yellowstone National Park hosted more than four million visitors. *See* National Park Service, *Annual Visitation Highlights*, available at perma.cc/KR7L-85T2 (last visited, Dec. 3, 2020).

their natural resources. This guarantee includes the assurance that the government will not take actions jeopardizing such unique and treasured facets of Montana's natural environment without first thoroughly understanding the risks involved.

¶75 The Attorney General does not contest the assertion that the 2011 MEPA amendments render the statute incapable of protecting Council and Coalition's constitutional rights, but, rather, points to the MMRA and a host of other substantive environmental laws as evidence that the Legislature has met its burden of providing Council and Coalition with "adequate remedies," even absent meaningful MEPA remedies. The Attorney General points to various ways in which these provisions protect environmental interests by regulating Lucky's behavior and providing remedies— including injunctive relief—should Lucky violate these provisions.

¶76 These cumulative efforts to meet the Legislature's constitutional obligations, however, fail to show that MEPA is redundant within Montana's ecosystem of environmental protections. MEPA is unique in its ability to avert potential environmental harms through informed decision making. As Delegate Mae Nan Robinson pointed out during the 1972 Constitutional Convention, a remedy implemented only *after* a violation is a hollow vindication of constitutional rights if a potentially irreversible harm has already occurred. *MEIC I*, ¶ 71 (citing Montana Constitutional Convention, Verbatim Transcript, March 1, 1972, Vol. V 1230) (noting the ineffectiveness of remedies after "the air has been polluted or . . . the stream has been polluted if you can't change the condition of the environment once it has been destroyed"). Furthermore, MEPA's environmental review process is complementary to—rather than duplicative of—other environmental provisions,

38

functioning to, for example, enable DEQ to make an informed decision in responding to Lucky's operational permit application under the MMRA. Without some other equally proactive and preventative measure in place, injunctive relief available under MEPA *before* action commences remains essential to fulfilling the constitutional mandate.

¶77 The Attorney General's reliance on *N. Plains Res. Council, Inc. v. Mont. Bd. of Land Comm'rs,* where we upheld leases made to Arch Coal prior to environmental review, actually demonstrates this point. *Northern Plains Res. Council, Inc. v. Mont. Bd. of Land Comm'rs*, 2012 MT 234, 366 Mont. 399, 288 P.3d 169. There, we upheld the leases at issue because the environmental review would still occur before the permitting stage and the leases themselves allowed for no environmental degradation. *Northern Plains*, ¶ 19 ("Those reviews are only deferred from the leasing stage to the permitting stage."). *Northern Plains* demonstrates that the relevant question is whether an environmental review occurs at some point *before* decisions are made and actions are taken which have the potential for causing environmental harm. Lucky and the Attorney General's opposite contention, that the environmental review may constitutionally occur *after* the project has begun, is unsupported.

¶78 We are not asked here to engage in a difficult exercise of determining what attributes constitute a "clean" or "healthful" environment, or an "unreasonable" amount of degradation, or what the judiciary's role should be in answering these questions. The question presented to us by this case is straightforward: has the Legislature met its obligation to provide "adequate remedies" with which to prevent potential future

environmental harms when it removes what appears to be the *only* available legal relief positioned to do so? We conclude that it has not.

¶79 Having determined that § 75-1-201(6)(c) and (d), MCA (2011 Amendments), fails to meet the State's constitutional obligations and burden constitutional rights, we now turn to selecting the appropriate level of scrutiny with which to analyze these provisions. We have determined that the rights found in Article II, Section 3, and Article IX, Section 1, of the Montana Constitution are fundamental rights and should be subject to strict scrutiny. *MEIC I*, ¶¶ 63-64. The Attorney General does not contest the District Court's finding that the 2011 Amendments fail under strict scrutiny but instead asks us to analyze the 2011 Amendments by balancing environmental rights against the private property rights also found in the Montana Constitution. *See* Mont. Const. art. II, § 3 (setting forth inalienable rights including the right of "possessing and protecting property"); Mont. Const. art. II, § 17 (providing the right to due process protection of property); Mont. Const. art. II, § 29 (protecting right to just compensation for taking of private property).

¶80 Balancing may be appropriate when a case presents an irreconcilable conflict between the co-equal rights of the parties. *See, e.g., Bozeman Daily Chronicle v. City of Bozeman Police Dep't.*, 260 Mont. 218, 224, 859 P.2d 435, 439 (1993) (addressing right to privacy's limitation on the public's right to know). Here, however, MEPA's enforcement does not implicate Lucky's private property rights to a constitutionally cognizable degree. When "regulations are designed to have a real and substantial bearing upon the public health, safety, morals and general welfare of a community, such regulations do not unduly interfere with the fundamental nature of private property ownership."

40

*Williams v. Bd. of Cty. Comm'rs of Missoula Cty.*, 2013 MT 243, ¶ 56, 371 Mont. 356, 308 P.3d 88 (internal quotations omitted). MEPA poses even less of a burden on private property ownership than regulations designed to protect the general welfare. As the Attorney General points out, MEPA is procedural and contains no regulatory language. While it directs the government to engage in informed decision making, MEPA itself does not restrict Lucky's use of its private property.

¶81 Restrictions on Lucky's ability to conduct mining operations on its private property stem from the MMRA, rather than MEPA. Completely apart from MEPA or its 2011 Amendments, the MMRA forbids Lucky from commencing mining activities until permitted to do so by the State. Section 82-4-335(1), MCA. Government regulation of mining has never been held to pose an undue burden on private property rights. *See, e.g., Northern Plains*, ¶ 17 (noting that mining companies "have no right to engage in mining operations until all necessary permits required by State law or regulation are obtained."); *Seven Up Pete Venture v. State*, 2005 MT 146, ¶¶ 27-28, 327 Mont. 306, 114 P.3d 1009 ("Clearly, the right to mine is conditioned upon the acquisition of an operating permit."). If the MMRA's requirement that Lucky await DEQ approval prior to commencing exploration activities does not cognizably burden a constitutional property right, then MEPA's requirement that DEQ's decision on the matter be well-informed certainly does not either.

¶82 Neither does an equitable remedy for a MEPA violation substantially interfere with constitutionally protected property rights. In essence, it simply requires an applicant to undergo the same wait now that it should have experienced before. There is no argument

41

that simply waiting for DEQ to properly review and act upon an application constitutes an infringement upon property rights. Had DEQ completed the analysis of wildlife impacts and artesian flow containment plans *before* issuing the exploration permit, as required by MEPA, Lucky could not have complained that its private property rights were burdened by being forced to wait for that process to be completed. Waiting while DEQ completes that review *now* does not signify a substantially greater constitutional burden than that which would have been felt while awaiting the completion of that same review process when it should have occurred—*before* the permit was issued. That DEQ's error may give rise to some administrative delay with which to cure the shortfall does not demonstrate an unconstitutional infringement of private property rights.

¶83    DEQ's erroneously premature approval of Lucky's application did not grant Lucky an irrevocable and constitutionally-protected private property right. Even after a permit has been granted, DEQ has broad enforcement powers to address subsequent violations, including through permanent injunctive relief. *See* § 82-4-361(5), MCA. We do not see why a court-ordered injunction to remedy a MEPA violation poses more of a threat to property rights than an agency-ordered injunction to remedy a substantive violation. Any private property rights implicated by an equitable remedy here are far too minor to be constitutionally cognizable and move us from a strict scrutiny to a balancing analysis.

¶84    As noted previously, the parties do not contest the District Court ruling that the 2011 Amendments fail under strict scrutiny. They do not attempt to demonstrate the 2011 Amendments are narrowly tailored to further a compelling government interest. Because § 75-1-201(6)(c) and (d), MCA, burdens Counsel and Coalition's fundamental

42

constitutional rights and does not withstand strict scrutiny, we hold that these amendments are unconstitutional under Article II, Section 3, and Article IX, Section 1, of the Montana Constitution.

¶85 The parties disagree on whether we should view this as an as-applied or facial constitutional challenge. *See Mont. Cannabis Indus. Ass'n v. State*, 2016 MT 44, ¶ 14, 382 Mont. 256, 368 P.3d 1131 ("In order to prevail on their facial challenges, Plaintiffs must show that 'no set of circumstances exists under which the [challenged sections] would be valid, *i.e.*, that the law is unconstitutional in all of its applications.'" (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449, 128 S. Ct. 1184, 1190 (2008)) (alterations in original)). The distinction is perhaps overstated. *See Citizens United v. FEC*, 558 U.S. 310, 331, 130 S. Ct. 876, 893 (2010) ("[T]he distinction between facial and as-applied challenges is not so well defined[.]").

¶86 Courts seek to resolve the controversy at hand, not to speculate about the constitutionality of hypothetical fact patterns. *See New York v. Ferber*, 458 U.S. 747, 767-68, 102 S. Ct. 3348, 3360 (1982) (noting the Court's general reluctance to make a facial ruling by "consider[ing] every conceivable situation which might possibly arise" (quotations omitted)). Generally, a statute's facial invalidity does not depend upon the characterization of the challenge brought; rather, it results from our duty to fashion an appropriate remedy in resolving the case before us and to subsequently adhere to the resulting opinion's precedential reasoning. *See Citizens United*, 558 U.S. at 331, 130 S. Ct. at 893 (noting that the distinction between a challenged provision's facial and as-applied constitutionality has no "automatic effect" but, rather, "goes to the breadth of the remedy

43

employed by the Court"); *see also* Richard H. Fallon, Jr., *As-Applied and Facial Challenges and Third-Party Standing*, 113 Harv. L. Rev. 1321, 1339-41 (2000) (describing facial unconstitutionality as an outgrowth of the precedential effects of as-applied determinations). Here, the 2011 Amendments are unconstitutional because they substantially burden a fundamental right and are not narrowly tailored to further a compelling government interest. Thus, our conclusion that § 75-1-201(6)(c) and (d), MCA, is unconstitutional flows from the content of the statute itself, not the particular circumstances of the litigants. *See* Fallon, *supra*, at 1338 (describing how application of strict scrutiny to a statute "can inevitably result in facial invalidations"). This is the hallmark of facial unconstitutionality.

¶87 In *MEIC I*, we held that the challenged statute was subject to strict scrutiny and that it violated environmental rights but limited our decision to the application of the facts of that case. *MEIC I*, ¶¶ 63, 80. In a special concurrence, Justice Leaphart wrote:

> I do not see how the Court can logically avoid declaring that the statute is unconstitutional on its face. The constitutional infirmity of § 75-5-317(2)(j), MCA (1995), is not limited to the facts in the present case but inheres in the statute's creation of a blanket exception. It creates a blanket exception to the requirements of nondegradation review for discharges from water well or monitoring well tests without regard to the harm caused by those tests or the degrading effect that the discharges have on the surrounding or recipient environment. The fact that there may be water discharges from well tests, say for agricultural purposes, that do not in fact create harm to the environment, does not alter the fact that such discharges are exempted from nondegradation review and that such review is the tool by which the State implements and enforces the constitutional right to a clean and healthy environment. The facial unconstitutionality of § 75-5-317(2)(j), MCA (1995), lies in its exemption of particular water discharges from nondegradation review without consideration of the nature and volume of substances in the water that is discharged. The possibility that some water discharges will not harm the environment does not justify their

> exemption from careful review by the State to protect Montana's fundamental rights to a clean and healthy environment and to be free from unreasonable degradation of that environment. The whole purpose of the nondegradation review is to determine, in advance, whether a water discharge will be harmful and, if so, is the harm justified and can it be minimized. *See* § 75-5-303, MCA. In excluding water discharges from well tests from review, the statute makes it impossible for the State to "prevent unreasonable depletion and degradation of natural resources" as required by Article IX, Section 1(3), of the Montana Constitution.

*MEIC I,* ¶ 85 (Leaphart, J., specially concurring).

¶88    As in *MEIC I*, the 2011 Amendments at issue here are unconstitutional because they undercut the State's ability to determine in advance whether a given activity will cause environmental harm and thereby take actions to "prevent unreasonable depletion and degradation of natural resources" as required by Article IX, Section 1(3), of the Montana Constitution. Additionally, the 2011 Amendments categorically remove the Plaintiffs' only available remedy adequate to prevent potential constitutionally-proscribed environmental harms, in violation of Article IX, Section 1(3), of the Montana Constitution's guarantee of "adequate remedies." The constitutional infirmities here, as in *MEIC I*, are not limited to the present facts but stem from the statute itself. We find Justice Leaphart's reasoning persuasive and adopt it here.

¶89    MEPA is an essential aspect of the State's efforts to meet its constitutional obligations, as are the equitable remedies without which MEPA is rendered meaningless. Section 75-1-201(6)(c) and (d), MCA, by seeking to deny the people of Montana these remedies, falls short of the constitutional guarantee and is therefore facially

45

unconstitutional.[5] Vacatur of the previously issued exploration permit is an equitable remedy suitable to the present MEPA violations and we affirm the District Court decision to that effect.

## CONCLUSION

¶90 We reverse the District Court ruling requiring DEQ to conduct supplemental review of water quality issues, additional analysis of alternatives, and possible impacts of potential future full-scale mining of federal lands. We affirm the District Court ruling requiring DEQ to conduct supplementary review of the impacts of road improvements on wildlife in the area. We also affirm the District Court ruling requiring DEQ to specify mitigation plans for capturing expected artesian flows during drilling. Finally, we affirm the District Court's order vacating Lucky's current exploration license and finding § 75-1-201(6)(c) and (d), MCA, in violation of the Legislature's constitutional mandate to provide remedies adequate to prevent proscribed environmental harms under Article II, Section 3, and Article IX, Section 1, of the Montana Constitution.

/S/ MIKE McGRATH

We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ LAURIE McKINNON

---

[5] Because we find § 75-1-201(6)(c) and (d), MCA, unconstitutional under the environmental provisions of Article IX, Section 1, and Article II, Section 3, of the Montana Constitution, we need not determine whether the District Court was correct in finding the 2011 Amendments to also be in violation of the right of public participation found in Article II, Section 8, of the Montana Constitution.

/S/ INGRID GUSTAFSON
/S/ DIRK M. SANDEFUR
/S/ JIM RICE